IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-030

Filing Date: August 16, 2012

Docket No. 32,120

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

JULIAN TAFOYA,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY
Charles C. Currier, District Judge

Jacqueline L. Cooper, Chief Public Defender
Adrianne R. Turner, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

SERNA, Justice.

{1}     On the night of November 15, 2008, while aimlessly driving around Roswell, New Mexico, Julian Tafoya (Defendant) shot and killed Andrea Larez, and shot and injured Crystal Brady. Larez and Brady were sitting in the front of the car and Defendant and his girlfriend, Kaprice Conde, were sitting in back. Defendant was convicted by a jury of first degree felony murder with the predicate felony of "shooting at or from a motor vehicle," NMSA 1978, § 30-3-8(B) (1993), attempted first degree murder, and tampering with evidence. The trial court also found Defendant guilty of being a felon in possession of a

1

firearm after the jury issued a special verdict finding that Defendant committed the above crimes with a firearm. Defendant was sentenced to life imprisonment plus seventeen and one-half years.

**{2}** Defendant now appeals his convictions to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA. Defendant first argues that his felony murder conviction should be reversed because shooting entirely within a motor vehicle is neither shooting "at" nor "from" a motor vehicle pursuant to Section 30-3-8(B), and therefore cannot serve as the predicate felony for his felony murder conviction. We agree with Defendant and, for reasons discussed more thoroughly below, remand to the trial court to vacate the felony murder conviction and enter judgment for second degree murder. *See generally State v. Haynie*, 116 N.M. 746, 748, 867 P.2d 416, 418 (1994) (discussing the authority of an appellate court to remand for entry of judgment when evidence supports conviction on the lesser included offense). We therefore do not reach Defendant's second argument, that shooting at or from a motor vehicle cannot serve as the requisite collateral felony for a felony murder conviction.

**{3}** Defendant further argues that there was insufficient evidence of deliberation to support his conviction for attempted first degree murder. We agree, and seeing no dispute that the evidence supports a finding on the lesser included offense of attempted second degree murder, we remand the case for entry of judgment for second degree murder. *See id.*

**{4}** We reject Defendant's final two arguments: that his sentence for attempted murder was improperly enhanced because the same prior felonies were used both to enhance that sentence and to establish his guilt on the felon in possession of a firearm charge, and that he received ineffective assistance of counsel. We remand to the trial court for proceedings consistent with this Opinion.

## I.    BACKGROUND

**{5}** Crystal Brady, Andrea Larez, and Kaprice Conde picked Defendant up at an Allsup's Convenience Store in Roswell the night of November 15, 2008. Conde and Defendant were dating, and Brady, Conde, and Defendant had been hanging out at a motel together earlier that day. Brady testified that she was addicted to methamphetamine (meth) at the time, and that before the shooting the three of them had been smoking meth and marijuana, and drinking alcohol. Conde testified that she had been up for five days partying, was high on meth at the time, and was also addicted to the drug. Bloodwork done during Larez's autopsy revealed she had also been using meth.

**{6}** After picking Defendant up, the four proceeded to cruise around the city listening to loud music. Brady testified that during this time she and the other occupants of the car were smoking meth and marijuana and drinking alcohol. Brady was driving the car, which belonged to Larez. The car had a standard transmission, which was unfamiliar to Brady, and

at one point "[she] heard a loud sound, and [the car] stalled out." Right after the car stalled, Defendant shot Larez. Conde and Brady both testified that there was a sudden gunshot followed by more shots. An officer in the area described the gunfire as multiple shots in fairly rapid succession, possibly with a short pause between the fourth and fifth shot.

**{7}** After the first shot, Brady observed that Larez had been shot and appeared to have died instantly from the wound. When asked what Brady was thinking after she saw that Larez had been shot, she testified that "[she] didn't [think]—it was all so sudden." Brady further testified that upon seeing that Larez had been shot, she turned toward the back of the car screaming and was shot in the face. Brady testified that she only remembers Defendant's face, does not remember him saying anything, that "he looked like a scared little punk," and that she thought Defendant was really high. After being shot, Brady was able to exit the car and crawl away for help. Defendant and Conde also exited the car and ran away, ultimately taking separate paths.

**{8}** Physical evidence presented at trial showed that Larez and Brady were both shot only once: Larez through the back of the neck and Brady in the face through her right nostril. A fragment of a bullet was recovered below a crack in the windshield, and an additional bullet was found lodged in the steering wheel. This, other evidence collected from the vehicle, and the nature of the wounds indicated that the shots were fired entirely within the vehicle—from the back seat to the front two seats of the car. Further factual development is provided below as necessary for the legal analysis.

## II. DISCUSSION

### A. Shooting entirely within a motor vehicle is not "shooting at or from a motor vehicle" for purposes of Section 30-3-8(B)

**{9}** Defendant first argues that the felony crime of "shooting at or from a motor vehicle" cannot serve as the predicate felony for his felony murder conviction because Defendant and the two victims were all in the same car together. Defendant was never charged with violating Section 30-3-8(B), and the State made the decision a week before trial to use the crime as the underlying felony for its felony murder theory. We note as a preliminary observation that, during defense counsel's directed verdict motions after the State rested its case, the prosecutor made the following concession:

> I realize that most shooting from a motor vehicle cases involve[] someone shooting at a target outside a car. I'm sure that the legislat[ure] was thinking to a large extent of a drive-by shooting where someone drives by someplace in a car and shoots and they are on their way. And the legislat[ure] wanted to make a crime shooting from or at a motor vehicle that encompass[es] that.

**{10}** Despite its stated understanding of the general purpose of Section 30-3-8(B) at trial, the State here argues that the Legislature did not intend to limit shootings involving motor

3

vehicles in this manner. Defendant, on the other hand, asserts that shooting wholly within a vehicle simply cannot constitute shooting "at" or "from" a vehicle. While we acknowledge that arguments can certainly be made either way, we agree with Defendant and hold that the Legislature intended to cover two distinct and contrasting factual scenarios involving two distinct and contrasting trajectories: (1) the discharging of a gun from a space clearly outside of and away from the vehicle *at* the vehicle, and (2) the discharging of a gun *from* a vehicle at something clearly *outside* of the vehicle. If the Legislature intended for Section 30-3-8(B) to additionally cover shootings occurring entirely within a vehicle, it could have done so with ease—for example, by adding the word "in," or the term "from within" to the statute. In concluding that the intended scope of Section 30-3-8(B) is ultimately unclear, albeit logically weighing more toward a categorical exclusion rather than inclusion of these facts, we apply the rule of lenity in favor of Defendant. *See State v. Johnson*, 2009-NMSC-049, ¶ 18, 147 N.M. 177, 218 P.3d 863 ("[L]enity is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute.") (emphasis omitted) (quoting *State v. Ogden*, 118 N.M. 234, 242, 880 P.2d 845, 853 (1994)).

**1. Plain-Language Reading of Section 30-3-8(B)**

**{11}** Questions of statutory interpretation are reviewed de novo, with the ultimate goal of such review to be "facilitat[ing] and promot[ing] the legislature's accomplishment of its purpose . . . ." *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994); *see also State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022. In analyzing a statute, we first look at the plain language of the statute. *See Smith*, 2004-NMSC-032, ¶ 9. We use caution when attempting to discern legislative intent by looking only to the words themselves, however, because this "beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate . . . differences of opinion concerning the statute's meaning." *Id.* (quoting *Helman*, 117 N.M. at 353, 871 P.2d at 1359).

Section 30-3-8 reads, in pertinent part:

> **Shooting at dwelling or occupied building; shooting at or from a motor vehicle:**
>
> . . .
>
> B. Shooting at or from a motor vehicle consists of willfully *discharging a firearm at or from a motor vehicle* with reckless disregard for the person of another.

(emphasis added)

**{12}** We begin our discussion of the language of Section 30-3-8(B) by noting the inherent

4

ambiguity that "function words" such as "at" and "from" present, because by their very nature these words have "little semantic content of [their] own and chiefly indicate[] a grammatical relationship." The American Heritage Dictionary of the English Language 712 (4th ed. 2000). Function words are commonly described in grammar lessons as a lexical glue used to connect together "content words"—words "that have a statable lexical meaning, rather than indicating a syntatic function, as . . . function word[s] do[]." *Id.* at 397.

**{13}** Dictionaries consistently provide two categorically distinct definitions of "from," one of which emphasizes the point of origin. *See, e.g.*, Black's Law Dictionary 668 (6th ed. 1990) (defining "from" as "a starting point . . . noting the point of departure, origin, withdrawal, etc."); 1 The New Shorter Oxford English Dictionary 1032 (1993) (defining "from" as "the starting-point or the first of two boundaries of an extent in space"); American Heritage Dictionary, *supra*, at 706 (defining "from" as "indicat[ing] a specified place or time as a starting point").

**{14}** The second category of definitions, however, is considerably more expansive than the first. Black's Law Dictionary, for example, identifies that "[o]ne meaning of 'from' is 'out of.'" Black's, *supra*, at 668. Similarly, the dictionaries cited above containing "point-of-origin" definitions also provide a definition of "from" that indicates the crossing of, or removal from, some tangible (or non-tangible, as the case may be) boundary. *See, e.g.*, American Heritage Dictionary, *supra*, at 706 (defining "from" as "[u]sed to indicate separation, removal, or exclusion."); New Shorter Oxford English Dictionary, *supra*, at 1032 (defining "from" as "denoting a departure or moving away").

**{15}** This first grouping of definitions defines "from" in its most literal sense, only speaking to the starting point or origin; thus, it leaves open the question of the subsequent route or end point of any motion beyond that point of origin. On the other hand, the trajectory of the motion, and specifically its separation from the point of origin, serves as the conceptual basis for the second grouping of definitions. A plain language reading of Section 30-3-8(B) using the first, literal, interpretation leads to the conclusion that the statute is quite expansive in scope and would potentially cover shooting from within a motor vehicle at anything *inside or outside* of the motor vehicle. A reading of Section 30-3-8(B) using the second interpretation, however, leads to the conclusion that "shooting from a motor vehicle" indicates the shot is proceeding "out of" or "departing" from the point of origin—the vehicle.

**{16}** Looking to the other language employed within Section 30-3-8(B), we see that there are two distinct and alternative ways to violate the statute. While one can shoot "from" a motor vehicle, one can also shoot "at" a motor vehicle pursuant to subsection (B). Thus, shootings following two different trajectories would serve to violate this subsection of the statute, each requiring the crossing of a distinct physical boundary—bullets necessarily headed toward the vehicle from a point outside of the vehicle, and bullets necessarily headed away from the vehicle from a point inside of the vehicle. This alternative construction indicates that the two trajectories are intended to be construed as opposite-but-equal actions, much in the same way we contrast opposite-but-equal actions in everyday conversational

5

English. For example, "*Are you coming or going?*" "*Do you want to sit inside or outside?*" "*Here or there?*"

**{17}** Based on the structure of the statute, then, it would seem illogical that one of the two words, "from," is only meant to indicate the point of origin and would cover a shot discharged from within a vehicle headed anywhere whatsoever, but the other word, "at," only covers shots specifically fired toward a vehicle from some point outside of the vehicle. This observation is not meant to suggest that the word "at" has a single unambiguous meaning. In fact, it appears that the true definition of "at" is susceptible to similar interpretative debate.[1] Rather, in our view, absent any intent by the Legislature to interpret the two terms differently, both "at" and "from" should be read with the same level of restrictiveness. *See generally Key v. Chrysler Motors Corp.*, 121 N.M. 764, 769, 918 P.2d 350, 355 (1996) ("[A]ll parts of a statute must be read together to ascertain legislative intent. We are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole.") (internal citation omitted).

**{18}** California courts have rejected a similar interpretation of the word "at" in the state's "shooting at a dwelling" statute, holding that one cannot shoot "at" a dwelling while situated entirely within that same dwelling. Subsection (A) of Section 30-3-8, "shooting at a dwelling," employs language identical to Section 30-3-8(B), only without the "from" component. Subsection (A) provides that "[s]hooting at a dwelling or occupied building consists of willfully discharging a firearm at a dwelling or occupied building." Similarly, California Penal Code Section 246 (West 1988) proscribes "discharg[ing] a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle . . . ." In *People v. Stepney*, 120 Cal. App. 3d 1016, 1019 (Cal. Ct. App. 1981), a California appellate court, while acknowledging that "[a]n argument can be made that one can shoot *at* a building or automobile from within as well as from without," determined that firing a gun entirely within a dwelling does not constitute "discharging a firearm at an inhabited dwelling" pursuant to Section 246. *Id.* at 1021. The defendant in *Stepney* shot a television while standing inside of the house. *Id.* at 1018. The court concluded that, based on these facts, "[t]he most that can be said for [the defendant's] conduct was that he intentionally discharged a pistol within a dwelling." *Id.* at 1021.

**{19}** Similarly, in *People v. Morales*, 168 Cal. App. 4th 1075 (Cal. Ct. App. 2008), a California appellate court held that shooting from the inside of an attached garage through the kitchen door was not conduct falling under Section 246, noting that this was "firing *within* an inhabited dwelling, from one room of it into another." *Id.* at 1081. Further extending this line of reasoning, a California Appellate Court affirmed a conviction under the same statute where the defendant fired a gun within his apartment into the apartment

---

[1] "At" is defined as "[t]o or toward the direction or location of." American Heritage Dictionary, *supra*, at 112. Past analysis of the word "at" has noted that it is a "word of many meanings." *People v. Stepney*, 120 Cal. App. 3d 1016, 1019 (Cal. Ct. App. 1981).

below.  *People v. Jischke*, 51 Cal. App. 4th 552 (Cal. Ct. App. 1996).  In doing so, the court treated the neighboring apartment as a separate dwelling, *id.* at 556, and the defendant's gunshot crossed the spatial boundary of his own apartment and entered the different spatial boundary of his neighbor's apartment.

**{20}**    While *Stepney* and *Morales* acknowledge that one can conceivably shoot "at" a dwelling or motor vehicle while being situated *within* that same space, this action was defined by the courts as shooting within the dwelling or motor vehicle.  The same logic applies when looking at whether one can shoot "from" a vehicle while being situated within that same vehicle.  Consistent with the California courts' rationale and common English usage, we recognize that actions occurring entirely within specified locations are logically described as occurring *within,* or *in,* or *inside* of said location.  *See generally Ogden*, 118 N.M. at 243, 880 P.2d at 854 ("[T]he language of penal statutes should be given a reasonable or common sense construction . . . .").  If the Legislature in fact intended for such conduct to fall under either or both of these subsections of Section 30-3-8, it easily could have contrasted the existing "at" or "at or from" language, which, as discussed above, indicates the crossing of two contrasting physical boundaries, with an additional word or phrase indicating that, alternatively, the shooting need not cross any physical boundary whatsoever.  To criminalize shootings entirely within vehicles, the Legislature could have phrased the statute along the lines of: "A violation of Section 30-3-8(B) consists of willfully discharging a firearm at, from, *or within* a motor vehicle."  *Cf. Chatterjee v. King*, 2012-NMSC-019, ¶¶ 38-39, 280 P.3d 283 (concluding that "[h]ad the Legislature intended to equate 'natural mother' with 'birth mother' or 'biological mother,' it would have done so.").  Other state statutes, discussed below, have in fact worded statutes with a similar level of specificity so as to explicitly include or exclude such conduct.

### 2.    Review of Applicable Out-of-State Statutes

**{21}**    There is considerable variation in the wording other states have used in similar statutes.  Several state statutes, like New Mexico's, either employ the word "from" without further specifying the intended scope, or use different but equally ambiguous wording that leaves open the question of where the bullet must travel to trigger the statute.[2]  Other statutes, while similarly leaving unanswered whether the bullet must leave the vehicle, have

---

[2] *See* Ark. Code Ann. § 5-74-107(a)(1) (West 1993) ("A person commits unlawful discharge of a firearm from a vehicle . . . if he or she knowingly discharges a firearm from a vehicle . . . ."); Ga. Code Ann. § 16-5-21(a)(3) (West 2006) (A person commits aggravated assault when "discharging a firearm from within a motor vehicle toward a person or persons."); Mo. Ann. Stat. § 571.030(1)(9) (West 2012) (A person commits crime of "Unlawful Use of Weapons" when he or she "[d]ischarges or shoots a firearm at or from a motor vehicle . . . ."); Utah Code Ann. § 76-10-508(1)(a)(i) (West 2008) ("Discharge of a firearm from a motor vehicle" consists of "discharg[ing] any kind of dangerous weapon or firearm from an automobile or other vehicle").

formally labeled the statutes as "drive-by" statutes.[3]  This choice in captioning, although not conclusive proof of the requisite trajectory of the bullet, indicates a policy articulation more consistent with discharging a firearm in the direction of someone or something outside of the vehicle.  Still other statutes, some entitled "drive-by" statutes and others not, explicitly specify that the motor vehicle must play an active role in the shooting.  Language requiring the vehicle to be an active part of the commission of the crime also indicates that the statute would likely only cover shootings originating from the inside of the vehicle and directed outward.  *See* Colo. Rev. Stat. § 16-13-301(2.2) (2003) (A "Drive-by crime" "is committed while utilizing a vehicle for means of concealment or transportation."); La. Rev. Stat. Ann. § 14:37.1(A) (1993) ("Assault by drive-by shooting is an assault committed with a firearm when an offender uses a motor vehicle to facilitate the assault."); Okla. Stat. tit. 21, § 652(B) (2007) ("Every person who uses any vehicle to facilitate the intentional discharge of any kind of firearm . . . ."); *see also* Alaska Stat. Ann. § 11.61.190(a)(2) (West 1996) ("Misconduct Involving Weapons" requires the perpetrator to "discharge[] a firearm from a propelled vehicle while the vehicle is being operated . . . .").

{22}    Finally, and perhaps most telling for our purposes, several states either explicitly require that the perpetrator be shooting from within the vehicle at a target outside of the vehicle, or alternatively, explicitly include shootings occurring entirely within the vehicle. *Compare* Minn. Stat. § 609.66 (2011) ("Felony; drive-By Shooting" statute is violated when someone "while in or having just exited from a motor vehicle, recklessly discharges a firearm at or toward another motor vehicle or a building . . . ."), *and* N.C. Gen. Stat. § 14-34.9 (2008) ("Discharging a Firearm From Within an Enclosure" is committed "as a part of a pattern of criminal street gang activity, from within any building, structure, motor vehicle, or other conveyance, erection, or enclosure toward a person or persons not within that enclosure . . . ."), *with* Iowa Code § 708.6 (2002) ("Intimidation with a Dangerous Weapon" statute is violated when someone "shoots, throws, launches, or discharges a dangerous weapon at, into, or in a building [or] vehicle . . . occupied by another person . . . ."), *and* Va. Code § 18.2-286.1 (1990) ("Shooting From Vehicles So as to Endanger Persons" statute is violated when someone "while in or on a motor vehicle, intentionally discharges a firearm so as to create the risk of injury or death to another person . . . .").  Notably, of these statutes, the state of Nevada uses the term "within" to indicate one action—presumably shooting a gun entirely within the vehicle—and the term "from" to indicate a separate type of action—presumably shooting a gun at something outside of the vehicle.  Nev. Rev. Stat. § 202.287 (2003) ("Discharging Firearm Within or From Structure or Vehicle" statute is violated when "[a] person who is in, on or under a structure or vehicle and who maliciously

---

    [3] *See* Ariz. Rev. Stat. Ann. § 13-1209(A) (1994) ("Drive-By Shooting[]" consists of "intentionally discharging a weapon from a motor vehicle . . . ."; Miss. Code Ann. § 97-3-109(1) (West 1993) ("A person is guilty of drive-by shooting . . . by discharging a firearm while in or on a vehicle."); R.I. Gen. Laws § 11-47-61 (West 1990) ("Drive-By Shooting" consists of "discharg[ing] a firearm from a motor vehicle . . . .").

or wantonly discharges or maliciously or wantonly causes to be discharged a firearm *within or from* the structure or vehicle . . .") (emphasis added).

**{23}** While looking to similar state statutes cannot conclusively answer the question of what actions our own Legislature meant to proscribe when enacting Section 30-3-8(B), we find the general comparison instructive. The review highlights that the language in many of these statutes provides clarification regarding the intended scope of the law, falling into two different categories. First, many statutes have made clear within the title of the law itself that the legislative goal in enacting the statute was to punish drive-by shootings. Second, many statutes have included clear language that either includes or excludes shootings occurring entirely within vehicles. Absent legislative history or more policy-oriented statutory language, we find the second observation especially instructive, as it begs the conclusion that if our Legislature had intended to cover shootings entirely within vehicles, it would have done so by adding an additional word. *See generally Chatterjee*, 2012-NMSC-019, ¶¶ 38-39.

### 3.    Use of "From" in Other Laws and Regulations

**{24}** We note that in other laws and regulations involving motor vehicles, "from" is used to indicate movement originating within the vehicle and headed toward a location outside of the vehicle. One example is found in the area of special state hunting permits that allow for disabled hunters to shoot game from motor vehicles. Our administrative code contains such a provision, entitled "shooting from a vehicle," which provides that "[t]he holder of a handicap license is authorized to shoot at and kill protected species . . . from a stationary motor-driven vehicle . . . ." 19.31.10.13(I)(1) NMAC. Other states have regulations or statutes using similar wording. *See, e.g.*, Minn. Stat. § 97B.055 ("Hunting from vehicle by disabled hunters"); Mich. Comp. Laws § 324.40114(1)(2012) (authorizes "an individual who is unable to walk . . . to take game . . . from . . . a standing vehicle"); Iowa Admin. Code r. 571–51.8(2)(f) ("Shooting from a motor vehicle" - "Except where prohibited by law, a handicapped person meeting the conditions of this rule may shoot from a stationary motor vehicle."); *see also* Cal. Admin. Code tit. 14, § 251 ("No person shall pursue . . . any bird or mammal from any type of . . .vehicle[]"); *see also, e.g.*, N.J. Stat. Ann. § 39:4-64(a) (West 1993) (state littering regulation providing that "[n]o person shall throw or drop any bundle, object, article or debris of any nature *from a vehicle* . . . .") (emphasis added).

**{25}** We recognize the above laws and regulations address very different subject matters than does Section 30-3-8; however, we consider them by analogy to further understand the general use of "from" in describing actions originating within but culminating outside of vehicles. Although hunting or throwing trash from a vehicle, based on subject matter alone, indicates that the bullets or garbage must leave the vehicle, we find the equation of "from" with "out of" in these situations instructive.

### 4.    Policy Considerations

**{26}** Although the word "battery" does not appear within Section 30-3-8, it is located in Article Three of the state's criminal code, entitled "Assault and Battery." *See* NMSA 1978, §§ 30-3-1 through -18. In comparing the elements and penalties for Section 30-3-8(B) with the crime of aggravated battery, Section 30-3-5 (1969), there is a clear correlation. Section 30-3-8(B) provides that shooting at or from a motor vehicle (1) resulting in no great bodily harm is a fourth degree felony; (2) resulting in "injury to another person" is a third degree felony; and (3) resulting in great bodily harm is a second degree felony. The Aggravated Battery statute provides that the crime "consists of the unlawful touching or application of force to the person of another . . . ." Section 30-3-5(A). Aggravated battery resulting in great bodily harm, aggravated battery committed with a deadly weapon, or aggravated battery committed "in any manner whereby great bodily harm or death can be inflicted is guilty of a third degree felony." Section 30-3-5(C).

**{27}** While the most severe form of aggravated battery results in the commission of a third degree felony, the same magnitude of injury in the context of shooting from a vehicle results in the commission of a second degree felony. In other words, when the same magnitude of injury results from a shooting occurring almost anywhere else, the defendant faces a lesser charge. Thus, it can be said that Section 30-3-8(B) in essence serves as an elevated form of aggravated battery. *See generally State v. Dominguez*, 2005-NMSC-001, ¶ 37, 137 N.M. 1, 106 P.3d 563 (Chávez, J., dissenting) (articulating belief that the "Legislature intended to punish shooting from or at a vehicle as an elevated form of aggravated battery . . . .").

**{28}** It therefore follows that in order to justify the increase in penalty between these crimes there should be a meaningful distinction between the two. If the motor vehicle transforms the spatial orientation of the crime, there exists such a distinction. For example, the spatial orientation of a shooting has been transformed by a motor vehicle in a situation where someone fired shots from within a moving vehicle at someone outside of the vehicle. *See, e.g.*, *Dominguez*, 2005-NMSC-001, ¶ 4. Another example is a situation where someone fired shots from a moving vehicle at someone in another nearby car, *see, e.g.*, *id.*; *State v. Zamarripa*, 2009-NMSC-001, ¶ 2, 145 N.M. 402, 199 P.3d 846; *State v. Baca*, 1997-NMSC-059, ¶ 5, 124 N.M. 333, 950 P.2d 776, or in the "shooting at" context, where someone fired shots from a home or other building at a car passing by, *see, e.g.*, *State v. Garcia*, 2005-NMCA-042, ¶ 1, 137 N.M. 315, 110 P.3d 531.

**{29}** In *State v. Mireles*, the defendant, seated in the back of a parked car, shot the victim while he was getting into the same car. 2004-NMCA-100, ¶¶ 4-7, 136 N.M. 337, 98 P.3d 727. The defendant argued on appeal that insufficient evidence was presented to convict him of "shooting from a motor vehicle," in part because the vehicle was not in motion at the time of the shooting. *Id.* ¶ 39. After the victim was shot the first time, he fell to the ground, got up and ran away, and the defendant exited the vehicle in order to pursue the victim and shoot him again. *Id.* ¶¶ 5-7. The Court of Appeals rejected the defendant's argument, holding that "the unambiguous language of [Section 30-3-8(B)] does not require that the vehicle be in motion." *Id.* ¶ 39.

10

**{30}** The defendant in *Mireles* asked the Court of Appeals effectively to alter the plain wording of the 30-8-8(B)—a situation quite different from the present case, where we must assign the most plausible meaning to an ambiguous term in the same statute. Nonetheless, the facts of *Mireles* further support the notion that crime was transformed through use of a vehicle, albeit in perhaps a less conventional way. The defendant's friend was getting in the driver's seat of the vehicle when the defendant shot the victim the first time, and then acted as the "get-away" driver when the defendant jumped back in the car. 2004-NMCA-100, ¶¶ 5, 8. The car, carrying the defendant, then sped away from the scene. *Id.* ¶ 8. The vehicle in *Mireles* served as the getaway vehicle *and* served to block the defendant from view immediately preceding the shooting. Thus, although not in motion at the time of the shootings, the vehicle meaningfully changed the nature of the crime.

**{31}** In all of these scenarios, the circumstances of the shootings were transformed through the use of a vehicle. The vehicle can be the means through which the defendant is able to pass someone and fire shots quickly and without warning; the vehicle can be cover, or even the means to a quick getaway. By contrast, in cases like the present, where the vehicle was nothing more than the location where Defendant and his victims *both* happened to have been situated, the shooting lacks a meaningful distinction to justify its classification as a separate, and more severe, crime. Absent clear legislative direction to the contrary, we do not believe that the Legislature intended to create such a superficial distinction between shooting from a motor vehicle and aggravated battery.

**5.** **Shooting entirely within a vehicle is not shooting "from" a vehicle**

**{32}** In this Court's view, defining "from" as including "within" does not comport with the common understanding of the word as used in this context. This is demonstrated by the way the State discussed the charge in its own closing argument—by asking the jury to "find the defendant guilty of first degree murder . . . , because he shot *in* a vehicle in a way that took [Larez's] life." (emphasis added) This is simply the way an English speaker would describe what happened in that vehicle the night of November 15, 2008. At best, Section 30-3-8(B)'s use of the word "from" is ambiguous. Application of the rule of lenity is then appropriate in this case, as the rule is "reserved for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Johnson*, 2009-NMSC-049, ¶ 18 (internal quotation marks and citation omitted). The rule guides that in such situations, criminal statutes are to be construed in the defendant's favor. *See Ogden*, 118 N.M. at 242, 880 P.2d at 853. Due to the construction of the statute and the nature of the offense, we hold that Defendant's conduct fell outside of the conduct for which Section 30-3-8(B) provides punishment. Thus, "shooting at or from a motor vehicle" cannot serve as the predicate felony for Defendant's felony murder conviction.

**6.** **In finding Defendant guilty of felony murder, the jury necessarily found Defendant guilty of second degree murder**

11

**{33}**   The trial court instructed the jury that, in order for the jury to find Defendant guilty of felony murder, it was required to find beyond a reasonable doubt that Defendant "intended to kill or knew that his acts created a strong probability of death or great bodily harm." This is an articulation of the mens rea requirement for felony murder. *See generally State v. Frazier*, 2007-NMSC-032, ¶ 8, 142 N.M. 120, 164 P.3d 1. We have in the past acknowledged that "our felony-murder rule is best described as elevating the crime of second-degree murder to first-degree murder when the murder is committed during the course of a dangerous felony." *State v. Lopez*, 1996-NMSC-036, ¶ 8, 122 N.M. 63, 920 P.2d 1017; *see also* NMSA 1978, § 30-2-1(B) (1994) (instructing that one "commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another"). Thus, for the jury to find Defendant guilty of felony murder in this case, it necessarily must have found Defendant guilty of second degree murder.

**{34}**   Although we hold that Section 30-3-8(B) was improperly used as the predicate felony for felony murder, we accept the jury's finding of the elements of second degree murder within the felony murder instruction as a finding of guilt on second degree murder. Because we do not believe that the interests of justice would be better served by ordering Defendant a new trial, and because the record supports Defendant's conviction of second degree murder beyond a reasonable doubt, we remand to the trial court to vacate the felony murder conviction and for entry of judgment for second degree murder. *Cf. Haynie*, 116 N.M. 746, 748, 867 P.2d 416, 418 (considering the question of whether the "interests of justice" are better served by remanding a case for a new trial and concluding that they are not when the record supports conviction on the lesser included offense beyond a reasonable doubt) (discussing *State v. Garcia*, 114 N.M. 269, 276, 837 P.2d 862, 869 (1992)).

**B.      The evidence presented at trial was insufficient to support Defendant's attempted first degree murder conviction**

**{35}**   After the State rested its case, Defendant moved for a directed verdict as to the State's first degree murder theory for the killing of Larez and attempted first degree murder theory for the shooting of Brady. The trial court granted the directed verdict as to the first degree murder charge, but denied the motion as it related to the attempted first degree murder charge, finding sufficient evidence of deliberation for the attempted killing. We disagree with the trial court, and conclude that insufficient evidence was presented for the jury to establish a meaningful distinction between the first successful killing and the almost immediate second attempted killing. Because we conclude that the evidence fully supports a conviction on the lesser included offense of attempted second degree murder, we remand to the trial court to vacate the attempted first degree murder conviction and for entry of judgment on attempted second degree murder. *See generally Haynie*, 116 N.M. 746, 748, 867 P.2d 416, 418 (appellate court may remand for entry of judgment on the lesser included offense).

**{36}**   We view the evidence presented at trial in the light most favorable to the verdict and

"indulg[e] all permissible inferences" in favor of that verdict. *See Garcia*, 114 N.M. at 273, 837 P.2d at 866. The underlying determination this Court must make is whether any rational jury could reach the verdict beyond a reasonable doubt. *See id.* at 274. Although our review never serves as a substitution for the jury's fact-finding role, it is our duty to "scrutin[ize] . . . the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for conviction." *Id.*

**{37}** New Mexico's statutory scheme provides for two categories of intentional killings: "those that are willful, deliberate, and premeditated; and those that are committed without such deliberation and premeditation but with knowledge that the killer's acts create a strong probability of death or great bodily harm." *Garcia*, 114 N.M. at 273, 837 P.2d at 866. This Court has in the past articulated this categorical distinction as whether a killing was "deliberate and premeditated, or [whether it was] only rash and impulsive[.]" *Id.* "Thus, if the state merely proves that the accused acted rashly or impulsively, rather than deliberately, and if the accused acted intentionally and without justification or provocation, then the facts would only support second-degree murder." *State v. Adonis*, 2008-NMSC-059, ¶ 16, 145 N.M. 102, 194 P.3d 717.

**{38}** Although a seemingly straightforward distinction to draw, time has shown that sometimes this is far from the case. *See id.* ¶ 13 (acknowledging the inherent difficulty in articulating and applying the distinction between first and second degree murder and noting the importance of proper application to the fair administration of criminal justice). Well settled, however, is the principle that "[f]irst-degree murder is reserved for the most heinous and reprehensible of killings, and therefore deserving of the most serious punishment under this state's law." *Id.* ¶ 15 (quoting *Garcia*, 114 N.M. at 272, 837 P.2d at 865) (internal quotation marks and alteration omitted). Also well settled is the understanding that, due to the steep penalty reserved for first degree murder convictions, the Legislature did not mean for first degree murder to serve as a catch-all category for every intentional killing. *See generally Adonis*, 2008-NMSC-059, ¶¶ 15, 16; *Garcia*, 114 N.M. at 272, 837 P.2d at 865.

**{39}** Our first degree murder statute provides that in order for a jury to find a criminal defendant guilty of first degree murder beyond a reasonable doubt, the State must prove that the killing was "willful, deliberate and premeditated." NMSA 1978, § 30-2-1 (A)(1) (1994). This burden of proof has been articulated as the commission of "a killing with the deliberate intention to take away the life of another." *Adonis*, 2008-NMSC-059, ¶ 14 (quoting *Garcia*, 114 N.M. at 271, 839 P.2d at 864); *see also* UJI 14-201 NMRA (instructing that the killing must have been committed "with the deliberate intention to take away the life of" the victim). A great deal therefore hinges on the definition of "deliberate intent," as this serves as the distinction between first and second degree murder. UJI 14-201 defines the term to the jury using the following definition:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances

of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{40}    The jury in the present case was given this definition of deliberate intent and instructed that first degree murder is a killing "with the deliberate intention to take away the life of" the victim. The instruction was given for purposes of the attempted first degree murder charge for the shooting of Brady. *See* UJI 14-2801 NMRA (instructing that, in order to find the defendant guilty of attempting to commit the substantive felony offense, the jury must prove that the defendant intended to commit the felony, and that the "defendant began to do an act which constituted a substantial part" of the felony).

{41}    UJI 14-201, quoted above, explains to the jury that deliberate intent is the product of "careful thought and the weighing of the consideration for and against the proposed course of action." The instruction then contrasts this high level of requisite contemplation with killings that are the product of "[a] mere unconsidered and rash impulse, even though it includes an intent to kill." UJI 14-201. Then after instructing the jury that first degree murder requires a pragmatic decision to kill and that first degree murder is not an impulsive killing, the same jury instruction advises jurors that the deliberative process can occur within a short period of time. *See id*. The notion that careful reasoning can occur in a short period of time seems somewhat counterintuitive, and rash and impulsive killings are far more likely to be the product of an expedited decision-making process than are carefully contemplated killings. This Court has in the past entertained the question of how to quantify this complex temporal consideration. *See Garcia*, 114 N.M. at 275, 837 P.2d at 868 ("[W]hat is a short period of time? A second or two? If so, then it is hard to see any principled distinction between an impulsive killing and one that is deliberate and premeditated."). *See generally* Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico*, 18 N.M.L. Rev. 73, 87 (1988) ("By informing the jury that a deliberate intent can be formed in a short time, the instruction fails to recognize the relationship between the thought processes involved in deliberation and the time sufficient to engage them.").

{42}    Based on a common understanding of the amount of time it would reasonably take to carefully weigh options for or against doing anything, the only logical way to read this advisement, and the way it has been interpreted in passing within our case law, is to recognize that it is *possible* in certain cases for a jury to reasonably infer from evidence presented that the deliberative process occurred within a short period of time—the crucial element being the presentation of other evidence. *See generally State v. Bingham*, 719 P.2d 109, 113 (Wash. 1986) (en banc) (observing that allowing the mere "opportunity to deliberate" to serve alone as sufficient evidence of deliberate intent has been criticized as

14

"obliterat[ing] the distinction between first and second degree murder."). Cases that have affirmed first degree murder convictions where the killing(s) occurred within a short period of time have relied on evidence beyond the temporal aspect of the crime in order to find sufficient evidence of deliberation. *See, e.g.*, *State v. Lucero*, 88 N.M. 441, 443, 541 P.2d 430, 432 (1975) (relying on evidence that the defendant went with a loaded gun to a treatment center, where he was not a patient, confronted a known confidential informant and his wife, initiated a fight with the informant and called him a rat, and shot informant and his wife); *see also State v. Blea*, 101 N.M. 323, 325, 681 P.2d 1100, 1102 (1984) (relying on evidence that the defendant got into an argument with the two victims in a bar and shot one victim, chased the other victim out of the bar and shot him, and then returned to shoot the first victim again).

**{43}** This Court has in the past concluded that, while sufficient time elapsed for the defendant to theoretically form deliberate intent, insufficient indicia of deliberation was presented where "nothing in the evidence enabled the jury to infer . . . that [the defendant] *ever* formed such an intent." *Garcia*, 114 N.M. at 275, 837 P.2d at 868. In *Garcia*, the defendant and victim were fighting in the back yard of a home, appeared to reconcile, and then were later found fighting in the front yard. *Id.* at 270, 837 P.2d at 863. During the front-yard fighting, Defendant stabbed the victim multiple times. *Id.* Although we stated that the defendant *could have* formed deliberate intent in the ten to fifteen minutes between the fighting in the back yard and the fighting-turned-stabbing in the front, no evidence was presented to support such a formation. *Id.* at 275, 837 P.2d at 868.

**{44}** This Court rejected a similar argument in *State v. Adonis*, a case where the defendant, upon witnessing someone who regularly parked in the defendant's assigned parking space re-offend, ran out of his apartment and fired multiple shots, killing the victim. 2008-NMSC-059, ¶¶ 3-4. *Adonis* is distinguishable from the present case in that, while this Court was reviewing the record for sufficient evidence of the commission of first degree murder, it was in the context of the commitment proceedings of a defendant who was "dangerous and not competent to stand trial." *Id.* ¶ 5. The evidence was presented during an evidentiary hearing pursuant to NMSA 1978, Section 31-9-1.5 (1999), which requires the evidence to establish commission of the underlying qualifying felony by clear and convincing evidence—a lower burden of proof than was required for findings of guilt in the present case. *See Adonis*, 2008-NMSC-059, ¶ 11.

**{45}** We nonetheless find *Adonis* instructive in the present case because the fundamental question remains the same for both inquiries: Did the State present sufficient evidence to prove every element of first degree murder? *See id.* ¶ 18. *Adonis* ultimately held that there was no evidence to support a finding of deliberative intent—no evidence that the defendant had complained about people parking in his spot in the past or that he had ever before threatened anyone for doing so. *Id.* ¶ 21. While we conceded that the retrieval of a gun within his apartment before running outside to shoot the victim *could* have provided sufficient time for the defendant to form deliberative intent, the State did not produce evidence that "tend[ed] to show that [the defendant] actually did so." *Id.* ¶ 22 (quoting *State*

15

*v. Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863) (internal quotation marks omitted). Although the State theorized that the defendant was waiting for the victim to park in his spot, or that the defendant had otherwise prepared for this occasion, *Adonis* held that these formulations were nothing more than conjecture. *Id.* ¶ 21.

**{46}** In this case, the evidence showed that Defendant and the victims spent at least that day, if not also the preceding days, drinking and taking drugs. While aimlessly driving around Roswell drinking and doing more drugs, Defendant, without any evidence of motive, shot Larez and then in very quick succession shot Brady. Brady testified that she had seen Defendant earlier in the day with a gun but clarified that it was normal for the type of people she hung out with to regularly carry guns.

**{47}** Brady testified that she had no time to think about what had just happened, because it was "all so sudden. . . . it was just too quick." All testimony regarding the succession of shots supported the inference that the shots were all fired in a row, possibly with a very short pause in between the fourth or fifth shot. Although the testimony supports the inference that multiple shots were fired, both Larez and Brady were shot only once.

**{48}** Brady testified that she started screaming after Larez was shot, turned around, and then Defendant shot her. Brady testified that she did not recall Defendant saying anything to her, but that she thought he was really high.[4] Although the State theorized that Defendant made the conscious decision to kill Brady after shooting Larez in order to eliminate a potential eyewitness, as in *Adonis*, without any evidence to support the argument, this was nothing more than conjecture.

**{49}** Although both *Garcia* and *Adonis* ultimately held that the evidence presented was inadequate to support a finding of deliberation, both cases, unlike the present case, involved *some* evidence to review. For example, although we held in *Garcia* and *Adonis* that the temporal element of the killing was insufficient in itself to show deliberation, the facts of both cases establish that there was potentially enough time for deliberation. In this case, the evidence only establishes that the shots were fired in quick succession, and there may have been a very short pause between shots. Further, although the testimony presented in *Adonis* and *Garcia* was held to be too inferential, without more, to support deliberation, both cases involved at least some other evidence to consider. Testimony established that the defendant in *Adonis* told the victim's brother after-the-fact that this would "teach this guy a lesson not to park in my place no more." 2008-NMSC-059, ¶ 4. Under a lesser burden of proof, we held the evidence presented regarding deliberate intent in *Adonis* to be insufficient. *Id.* ¶ 11. Testimony similarly established that the defendant in *Garcia* commented earlier in the day that the victim needed to be removed "away from [the defendant] or you're not going to be

---

[4] The State attempted to establish that Brady told a detective in the hospital that Defendant said "now, plot on that, bitch" prior to shooting her. Brady testified that she did not "remember him saying a damn thing."

seeing him for the rest of the day." 114 N.M. at 275, 837 P.2d at 868. Testimony also established that the defendant in *Garcia* made the post-killing statement that "I told my brother that I did him and I'd do him again." *Id.*

**{50}** In this case, after hearing the above evidence, the trial court granted the directed verdict motion as to the theory of first degree murder for the killing of Larez. In doing so, the trial court remarked on the evidence, noting that:

> These people were apparently consuming drugs and alcohol for some period of time. And their level of paranoia may have reached a point where one or more of them was unable to control their behavior. I don't know. But in any event, it seems to me that [it] is at least as likely in this case that as opposed to a deliberate contemplated act by [Defendant] that it was as likely a rash or impulse to shoot [Larez].

**{51}** The trial court ultimately found, however, that because the State presented evidence that Defendant shot Brady after he shot Larez, "once he committed that act, it seems . . . that the next shooting that he engages in, the likelihood of impulse of just a reaction or something like that is less likely simply because she turns around and looks at him and there [are] some comments." Brady only testified that she started screaming, however, and that Defendant said nothing. Certainly, no evidence was presented that Defendant and Brady exchanged words before Defendant shot Brady.

**{52}** The only evidence that served to support the attempted first degree murder charge, therefore, was time: the passage of perhaps a second or two at most between Defendant's shooting of Larez and Brady. As mentioned above, although the State attempted to establish a motive by theorizing that Defendant decided to kill Brady because of her potential role as a witness against him, there was no evidence whatsoever to support such speculation. There was similarly no circumstantial evidence of earlier confrontation, threats, debts owed, or other common areas of friction leading to violence, nor was there physical evidence that would support the formation of deliberation. *See generally State v. Flores*, 2010-NMSC-002, ¶ 21, 147 N.M. 542, 226 P.3d 641(reviewing premeditated first degree murder case law discussed in *State v. Duran*, 2006-NMSC-035, ¶ 11, 140 N.M. 94, 140 P.3d 515, and this Court's prior determinations that rational juries could draw an inference of deliberation, for example, from "the large number of wounds, the evidence of a prolonged struggle, the evidence of the defendant's attitude toward the victim, and the defendant's own statements.").

**{53}** This lack of evidence undoubtedly influenced the trial court in its decision to grant Defendant's directed verdict motion on the count of first degree murder, but it is equally applicable to the attempted murder charge. The only distinction that can be drawn between the shooting of Larez and the shooting of Brady is that one happened immediately before the other, and that Brady started yelling or screaming between the two shootings. Without evidence that the screaming had a communicative purpose, this piece of evidence suggests

17

nothing more than a very brief expression of shock.  The void of evidence to support deliberate intent in this case is filled with evidence of rash and impulsive behavior, however.  Testimony established the fact that the passengers of the car were addicts, that they had been drinking and doing drugs earlier in the day, and they were drinking and doing drugs at the time of the shootings.  They were listening to loud music and driving around town, and then Defendant suddenly shot Larez and then Brady.

**{54}**    Although, as we have established, the law allows for a jury to infer that a short amount of time can be sufficient to form deliberate intent, without other evidence supporting the inference that deliberate intent was actually formed, it would be difficult to ever make a "principled distinction between an impulsive killing and one that is deliberate and premeditated."  *Garcia*, 114 N.M. at 275, 837 P.2d at 868.  With the complete absence of other evidence to support deliberation, we cannot hold that Defendant proceeded from the rash impulsive murder of Larez to the willful, deliberate and premeditated attempted murder of Brady simply because a second or two *might* have elapsed between the shots.

**{55}**    While we do not find sufficient evidence to support Defendant's conviction for attempted first degree murder, there is substantial evidence in the record that Defendant knowingly created a strong probability of death or great bodily injury and Defendant does not argue otherwise on appeal.  We therefore hold that the elements of attempted second degree murder have been met and remand the case for entry of judgment on the lesser included offense of attempted second degree murder.  *See Haynie*, 116 N.M. at 748, 867 P.2d at 418 (concluding that the "interests of justice" are not better served by remanding the case for a new trial when the record supports conviction on the lesser included offense beyond a reasonable doubt) (discussing *Garcia*, 114 N.M. at 276, 837 P.2d at 869).

**C.      Defendant was not subjected to double jeopardy when his prior felony convictions were used both to establish his status as a "Habitual Offender" for sentencing on one conviction and for purposes of establishing guilt for a separate conviction**

**{56}**    Defendant argues that the use of the same prior felony convictions to enhance his sentence for attempted murder under the habitual offender statute and to serve as the predicate felony for his conviction of felon in possession of a firearm violates double jeopardy.  *See* NMSA 1978, § 31-18-17 (2003); § 30-7-16 (2001).  In making this argument, Defendant relies on *State v. Haddenham*; however, this case stands for the proposition that a prior felony cannot serve as both the predicate for a conviction for felon in possession of a firearm *and* serve as the basis for the habitual offender enhancement of that same felon in possession of a firearm conviction.  110 N.M. 149, 154, 793 P.2d 279, 284 (Ct. App. 1990).  *See also generally State v. Gonzales*, 113 N.M. 221, 225, 824 P.2d 1023, 1027 (1992) (relying on *Haddenham* to vacate enhancement provision of the defendant's sentence for felon in possession of a firearm due to double jeopardy violation).

**{57}**    Unlike *Haddenham*, the sentence enhanced by the habitual offender statute in the

18

present case was the separate crime of attempted murder. The use of the prior felonies for the conviction for felon in possession of a firearm and enhancement of a *different* conviction does not violate double jeopardy. *Cf. State v. Handa*, 120 N.M. 38, 46, 897 P.2d 225, 233 (Ct. App. 1995) (holding that the use of a conditional discharge to convict the defendant of felon in possession of a firearm and to enhance sentence for assault on a peace officer did not violate double jeopardy).[5]

## D. Defendant has not established that he received ineffective assistance of counsel

**{58}** Finally, Defendant argues that he received ineffective assistance from counsel because his counsel failed to present evidence of Brady's past inability to stand trial as "crucial impeachment evidence." The record indicates that counsel attempted to impeach Brady's credibility in many ways during trial, including the use of her prior inconsistent statements, her history of drug addiction and impaired mental state at the time of the crimes, and her felony convictions for burglary and forgery. Because we conclude that counsel's performance was not deficient, we do not reach the question of prejudice.

**{59}** Criminal defendants are entitled to "reasonably effective" assistance of counsel under the Sixth Amendment. *State v. Schoonmaker*, 2008-NMSC-010, ¶ 29, 143 N.M. 373, 176 P.3d 1105. A successful claim for ineffective assistance of counsel requires Defendant to "establish that (1) counsel's performance was deficient, and (2) such deficien[t] performance resulted in prejudice . . . ." *See State v. Garcia*, 2011-NMSC-003, ¶ 33, 149 N.M. 185, 246 P.3d 1057. "An appellate court will not second-guess counsel's strategic judgment unless the conduct does not conform with an objective standard of reasonableness." *Id.* (quoting *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (internal quotation marks omitted). Claims of ineffective assistance of counsel are reviewed de novo. *Id.*

**{60}** Defendant's claim is based on evidence presented during a pre-trial competency hearing held roughly three months prior to trial in order to determine whether Brady was competent to testify as a witness in this case. Dr. Parsons, a psychologist who had evaluated Brady's competency to stand trial—as a defendant herself— in several prior cases, testified that in some situations Brady had been found competent to stand trial and in others not. Parsons testified that based on his assessment of Brady three months earlier, although Brady's thinking was disorganized and she had trouble talking about the shootings, she was not delusional or unable to answer questions about the incident in a logical manner. Parsons' ultimate conclusion was that her potential effectiveness and ability to testify in the present matter would largely depend on whether she was taking her prescribed medications and

---

[5] When the defendant in *Handa* was sentenced in 1990, the Criminal Sentencing Act prohibited the use of conditional discharges for purposes of sentencing enhancements. *See* § 31-18-17 (1983) (amended 1993). The defendant in *Handa* waived the right to object to the use of his conditional charge for this purpose. 120 N.M. at 45, 897 P.2d at 232.

whether she was on drugs. The trial court ultimately found Brady competent to testify at the upcoming trial.

**{61}** Defendant's argument appears to be that defense counsel was ineffective for specifically failing to present to the jury the fact that Brady had in the past been found incompetent to stand trial. Defendant fails to demonstrate how past questions of Brady's competency to stand trial herself were relevant or even related to her ability to testify as a witness in this case. As Parsons explained in his testimony, competency to stand trial and competency to testify are two different issues, the bar being higher for the former than the latter. *See generally State v. Najar*, 104 N.M. 540, 542, 724 P.2d 249, 251 (Ct. App. 1986) (addressing distinctions among the varying levels of mental condition and noting that competency to stand trial means the defendant must "understand[] the nature and significance of the proceedings, ha[ve] a factual understanding of the charges, and [be] able to assist his attorney in his defense"). Defendant similarly failed to demonstrate why this information was more crucial to Brady's impeachment than the numerous ways counsel in fact employed to impeach her credibility through his cross examination.

**{62}** During his cross examination of Brady, defense counsel presented the jury with examples of her prior inconsistent statements regarding the details of the shooting. Counsel also established that at the time of the incident, Brady was addicted to meth, and was high on meth the night of the shootings. Defense counsel additionally established Brady's own extensive experience with the criminal system, including her felony convictions for burglary and forgery. Further, defense counsel's cross examination generally exposed the jury to the fact that Brady was unstable and defensive; she was unable at several times during the examination to simply focus and answer questions without derailing or becoming angry.

**{63}** While Brady's behavior during cross examination was likely favorable to Defendant in that it served to make Brady look immature, unfocused, and aggressive—thus calling into question her general credibility as a witness—delving too far into the details of Brady's psychological evaluations could have shown that Parsons attributed much of Brady's disorganized thinking and behavior to the trauma she had experienced. This information could very well have served as a sympathetic explanation for her behavior and a reason to punish Defendant for being the source of that trauma. We conclude that counsel's handling of Brady's credibility during cross examination was objectively reasonable, and therefore do not reach the question of prejudice.

## III.    CONCLUSION

**{64}** We remand to the trial court to proceed in conformity with this Opinion.

**{65}    IT IS SO ORDERED.**

_____
**PATRICIO M. SERNA, Justice**

20

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Chief Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

**Topic Index for _State v. Tafoya_, No. 32,120**

**APPEAL AND ERROR**
Substantial or Sufficient Evidence

**ATTORNEYS**
Effective Assistance of Counsel

**CRIMINAL LAW**
Elements of Offense
Felony Murder
Shooting Offenses

**CRIMINAL PROCEDURE**
Enhancement of Sentence

**STATUTES**
Interpretation
Legislative Intent