# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:     _____

Filing Date: April 15, 2014

Docket No. 32,681

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

CAMERON SLADE,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF LEA COUNTY
Gary L. Clingman, District Judge

Gary K. King, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

Templeman and Crutchfield
C. Barry Crutchfield
Lovington, NM

for Appellant

## OPINION

**BUSTAMANTE, Judge.**

{1}     Defendant Cameron Slade was convicted of attempted first degree murder after attending a party that ended with one person dead and the victim, Brian Alexander, seriously injured from multiple gunshot wounds.  On appeal, Defendant maintains that there was insufficient evidence to support the jury's verdict. We agree that the State failed to meet its burden to demonstrate that Defendant acted willfully, deliberately, and with premeditated intent to kill the victim.  We further conclude that because the State elected to charge attempted first degree murder and not to instruct the jury on attempted second degree

1

murder, double jeopardy principles bar retrial of Defendant for the lesser included charge of attempted second degree murder. Defendant's conviction is reversed and his sentence vacated.

## BACKGROUND

**{2}** Defendant was charged with and convicted of attempted first degree murder for the shooting of Brian Alexander at a party in Hobbs, New Mexico. Alexander suffered multiple gunshot wounds. The other essential facts are as follows.

**{3}** After arriving at the party, Defendant waited outside the rented hall while his friend, J.J. Royal, and his cousin, Dedrick Thomas, went inside. Defendant was carrying a .38 revolver that he had borrowed from Royal, and Royal was carrying a semiautomatic .40 caliber pistol belonging to Defendant. Shortly after Royal and Thomas entered the hall, a fight erupted and Royal and Alexander stepped in to break it up. In an attempt to stop the fighting, the party's organizers turned on the lights and approximately thirty guests began leaving the hall. Once outside, the fight resumed a few yards away from the entrance. Royal and Alexander also left the hall and began fighting each other on a ramp just outside the hall's entrance. A friend and roommate of Alexander's, Alton Granville, also joined in the fight. Thomas returned to his car, which was parked a few yards away from the entrance, where he encountered Defendant. After Thomas told Defendant about the fight, Defendant wordlessly walked toward the hall entrance. Thomas then got in his car, drove toward the hall entrance, and parked in the street near the ramp.

**{4}** Moments later, Royal heard gunshots from an unknown location. Believing he had been shot, Royal drew the semiautomatic .40 caliber pistol and shot Granville four times, killing him. Royal also shot at Alexander several times as Alexander was running down the ramp and away from the hall entrance. Royal fired a total of six times.

**{5}** Eyewitness testimony about Defendant's whereabouts during the fighting was mixed. At trial, Alexander testified that he did not see Defendant at all during the shooting, but he had testified at a preliminary hearing that he had seen Defendant in the street. Thomas testified that he did not see Defendant near the fight and never saw him fire a weapon. Royal testified that he did not see Defendant shoot at any time.

**{6}** After the shooting began, Defendant was seen running with Royal away from the area of the fight, while people fired at them. Defendant and Royal then ran into an alley, pursued by people in a car who were also shooting at them. Royal exchanged weapons with Defendant and fired the .38 revolver at the vehicle one or two times.

**{7}** Meanwhile, Thomas, whose car had been hit with one bullet, returned to his apartment. Defendant arrived approximately thirty-five minutes later and hid the semiautomatic .40 caliber pistol in a bedroom closet. This weapon was later recovered from a house in Midland, Texas, belonging to a family member of Royal's. The barrel of the

2

weapon had been removed.

**{8}** Defendant and Thomas went to the Hobbs Police Department the next day to be interviewed. Defendant instructed Thomas to say that he did not know what had happened, and Defendant told the police during the interview that he went to the party only with Thomas, that he never saw Royal that night, that he stayed in his car most of the time he was there, and that he rode home with Thomas. Thomas testified that Defendant told him that Defendant had "shot . . . Alexander once." Royal also told police during the investigation that Defendant had admitted shooting Alexander one time, but at trial denied that Defendant had admitted to the shooting.

**{9}** Several different kinds of bullets and/or casings were recovered from the scene. Six Remington brand .40 caliber casings, later determined to have been fired by the semiautomatic .40 caliber pistol carried by Royal, were found near where Granville was shot. The single bullet recovered from Alexander's clothing was shown to have been fired by the same gun as two bullets found in Granville's body, although the forensic examiner could not assess whether the three bullets had been fired by the semiautomatic .40 caliber pistol because the barrel was missing. Five Federal brand .40 caliber casings were also recovered from the street near where Thomas and Defendant had parked. Analysis demonstrated that the Federal casings were all fired from the same weapon, but that weapon was never recovered. One 9 mm unfired bullet was also found at the scene. A bullet fragment found in Thomas's car was determined to be a different type than the bullets taken from Granville and Alexander. No .38 caliber bullets or casings were recovered from the scene or Alexander, although the .38 revolver itself was recovered from Royal's family member.

**{10}** After a jury trial, Defendant was convicted of attempted first degree murder and acquitted of tampering with evidence. He was sentenced to nine years of incarceration for attempted first degree murder and one year for the use of a firearm. Additional facts are included as necessary to our discussion.

## DISCUSSION

**{11}** Defendant argues that (1) the State's evidence fails to demonstrate that he shot Alexander at all; and (2) there was also insufficient evidence that he acted with the requisite intent for first degree murder, i.e., deliberate intent to kill. Defendant also argues that the "corpus delicti rule" was violated because the testimony as to his admission was not trustworthy and there was no independent evidence that Defendant shot Alexander. Because the disposition of Defendant's sufficiency arguments makes it unnecessary, we do not reach the latter point.

**A.     The Evidence of Deliberate Intent Was Insufficient**

**{12}** Defendant argues that the evidence presented at trial was "totally insufficient" to

3

support a conclusion that Defendant "committed any criminal act" and that the jury's verdict rested on "mere guess or speculation." Because the jury was instructed on and returned a verdict as to attempted first degree murder, we focus our analysis on the sufficiency of the evidence pertinent to that charge. We agree with Defendant's assertion that the evidence did not support a conclusion that he acted with deliberate intent. We begin by discussing the standard of review of such an assertion, first generally and then in the context of attempted first degree murder. We then apply the standard of review to the State's arguments.

## 1.     Standard of Review

**{13}**     On appeal, the appellate courts "review sufficiency of the evidence . . . from a highly deferential standpoint." *State v. Dowling*, 2011-NMSC-016, ¶ 20, 150 N.M. 110, 257 P.3d 930. All evidence is "viewed in the light most favorable to the [s]tate, [and we] resolv[e] all conflicts and mak[e] all permissible inferences in favor of the jury's verdict." *Id.* We examine each essential element of the crimes charged and the evidence at trial "to ensure that a rational jury could have found the facts required for each element of the conviction beyond a reasonable doubt." *Id.* The appellate courts "do not search for inferences supporting a contrary verdict or re-weigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285; *see State v. McGhee*, 1985-NMSC-047, ¶ 17, 103 N.M. 100, 703 P.2d 877 ("The determination of the weight and effect of the evidence, including all reasonable inferences to be drawn from both the direct and circumstantial evidence is a matter reserved for determination by the trier of fact.").

**{14}**     Although appellate courts are highly deferential to a jury's decisions, it is "the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Vigil*, 2010-NMSC-003, ¶ 4, 147 N.M. 537, 226 P.3d 636 (internal quotation marks and citation omitted); *see* UJI 14-6006 NMRA (stating that the "verdict should not be based on speculation, guess[,] or conjecture"). In other words, "[e]vidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition." *Baca v. Bueno Foods*, 1988-NMCA-112, ¶ 15, 108 N.M. 98, 766 P.2d 1332. This principle necessarily requires a reviewing court to distinguish between conclusions based on speculation and those based on inferences, a task that is not always straightforward. *See Romero v. State*, 1991-NMCA-042, ¶ 38, 112 N.M. 291, 814 P.2d 1019 ("[T]he line between speculation and reasonable inference is not always clear."), *aff'd in part, rev'd in part*, 1991-NMSC-071, 112 N.M. 332, 815 P.2d 628. Nevertheless, this Court has made clear that an inference must be linked to a fact in evidence. "A reasonable inference is a conclusion arrived at by a process of reasoning [which is] a rational and logical deduction from facts admitted or established by the evidence[.]" *Samora v. Bradford*, 1970-NMCA-004, ¶ 6, 81 N.M. 205, 465 P.2d 88; *see Bowman v. Inc. Cnty. of Los Alamos*, 1985-NMCA-040, ¶ 9, 102 N.M. 660, 699 P.2d 133 ("An inference is more than a supposition or conjecture. It is a logical deduction from facts which are proven, and guess work is not a substitute therefor." (internal quotation marks and citation omitted)). An ultimate inference

may not be based on a series of inferences. *See United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996) ("[A] verdict may not rest on . . . an overly attenuated piling of inference on inference."); *Hisey v. Cashway Supermarkets, Inc.*, 1967-NMSC-081, ¶ 7, 77 N.M. 638, 426 P.2d 784 ("It is true that [the] plaintiff is entitled to [resolution of] all inferences in [its] favor but such inferences must be reasonably based on facts established by the evidence, not upon conjecture or other inferences."). Finally, even when a permissible logical inference may be drawn from the facts, if it "must be buttressed by surmise and conjecture" in order to convict, the conviction cannot stand. *State v. Tovar*, 1982-NMSC-119, ¶ 8, 98 N.M. 655, 651 P.2d 1299 (internal quotation marks and citation omitted).

## 2. Application of the Standard of Review to This Case

**{15}** A review of the sufficiency of the evidence proceeds in a two-step fashion. "First we review the evidence . . . with deference to the trial court's resolution of factual conflicts and inferences[.]" *State v. Apodaca*, 1994-NMSC-121, ¶ 6, 118 N.M. 762, 887 P.2d 756. "[T]hen we make a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). Thus, our review necessarily occurs within the context of the crimes charged and the standard of proof at trial. *See State v. Wynn*, 2001-NMCA-020, ¶ 5, 130 N.M. 381, 24 P.3d 816 ("We must be satisfied that the evidence was sufficient to establish the facts essential to conviction with the level of certainty required by the applicable burden of proof."); *State v. Taylor*, 2000-NMCA-072, ¶ 18, 129 N.M. 376, 8 P.3d 863 (reviewing the evidence under a clear and convincing standard of proof).

**{16}** Here, because Defendant was charged with attempted first degree murder, the jury was instructed in the elements of both attempt and first degree murder. *See* UJI 14-2801 NMRA (attempt); UJI 14-201 NMRA (first degree murder). The murder statute defines first degree murder as a "willful, deliberate[,] and premeditated" killing. NMSA 1978, § 30-2-1(A)(1) (1994). The jury instructions associated with this statute require the jury to find that the defendant acted with "deliberate intention." UJI 14-201(2). Under these instructions, the State was required to prove that Defendant "deliberate[ly] inten[ded]" to kill Alexander. *See State v. Hernandez*, 1998-NMCA-167, ¶ 16, 126 N.M. 377, 970 P.2d 149 (stating that "the crime of attempt to commit a felony requires a specific intent to commit the underlying felony").

**{17}** The element of "willful, deliberate[,] and premeditated" intent, called "deliberate intention" in the jury instruction, distinguishes first degree murder from second degree murder. *See State v. Tafoya*, 2012-NMSC-030, ¶ 37, 285 P.3d 604 (stating that the distinction is "whether a killing was deliberate and premeditated, or . . . only rash and impulsive" (internal quotation marks and citation omitted)). What constitutes "deliberate intention" is thus a critical and difficult inquiry in first degree murder cases. *See id.* ¶ 38 ("Although a seemingly straightforward distinction to draw, time has shown that sometimes

this is far from the case."). What is clear, however, is that "first[]degree murder is reserved for the most heinous and reprehensible of killings[.]" *Id.* (alteration, internal quotation marks, and citation omitted). "Also well settled is the understanding that, due to the steep penalty reserved for first degree murder convictions, the Legislature did not mean for first degree murder to serve as a catch-all category for every intentional killing." *Id.* Consequently, "[t]o prove first[]degree murder, the [prosecution] has a heightened burden commensurate with the severity of punishment reserved for that crime." *State v. Adonis*, 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P.3d 717.

**{18}** Uniform Jury Instruction 14-201(2) provides insight into how to distinguish between "deliberate intention" and an impulsive act.

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

*Id.*

**{19}** As noted in *Tafoya*, this instruction embodies two seemingly opposite ideas: (1) that "deliberate intent" requires a "high level of requisite contemplation," and (2) that such contemplation may occur in a short period of time. *See* 2012-NMSC-030, ¶ 41 (stating that "[t]he notion that careful reasoning can occur in a short period of time seems somewhat counterintuitive, and . . . impulsive killings are far more likely to be the product of an expedited decision-making process than are carefully contemplated killings"). The problems posed by these apparently conflicting ideas have been addressed by New Mexico cases and scholars for over twenty years. *See, e.g.*, *State v. Garcia*, 1992-NMSC-048, ¶ 30, 114 N.M. 269, 837 P.2d 862 ("But what is a 'short period of time'? A second or two? If so, then it is hard to see any principled distinction between an impulsive killing and one that is deliberate and premeditated."); Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico*, 18 N.M. L. Rev. 73, 87 (1988) ("To engage in careful thought and to weigh the considerations for and against the proposed course of action that might result in a killing must involve the passage of time; otherwise, the formation of the intent to kill would be impulsive and rash." (footnote omitted)).

**{20}** The *Tafoya* Court resolved this conflict by "recogniz[ing] that it is possible in certain cases for a jury to reasonably infer from evidence presented that the deliberative process occurred within a short period of time—the crucial element being the presentation of other

evidence." 2012-NMSC-030, ¶ 42 (emphasis omitted). Hence, in those cases where deliberate intent was found to have been formed in a short period of time, there was "evidence beyond the temporal aspect of the crime in order to find sufficient evidence of deliberation." *Id.* In other words, mere evidence of sufficient time to form a deliberate intent is not enough to prove first degree murder. Rather, there must be other evidence that the defendant actually formed such intent. *See Adonis*, 2008-NMSC-059, ¶ 22 ("While the retrieval of a weapon before killing a victim could potentially give a killer an opportunity to deliberate, the burden remains on the [s]tate to produce evidence that tends to show that the killer actually did so." (internal quotation marks and citation omitted)).

**{21}** Such other evidence of deliberate intent may include "the large number of wounds, the evidence of a prolonged struggle, the evidence of the defendant's attitude toward the victim, and the defendant's own statements[,]" *State v. Flores*, 2010-NMSC-002, ¶ 21, 147 N.M. 542, 226 P.3d 641; as well as "a carefully crafted plan to kill," or "hot pursuit of the victim," *Taylor*, 2000-NMCA-072, ¶ 22. On appeal, these factors are viewed as a whole. We avoid "pars[ing] the testimony and view[ing] the verdict only in light of the probative value of individual pieces of evidence." *Graham*, 2005-NMSC-004, ¶ 13. Instead, although "each component may be insufficient to support the conviction when viewed alone [they may] form substantial . . . support for the conviction when viewed as a whole." *State v. Rojo*, 1999-NMSC-001, ¶ 23, 126 N.M. 438, 971 P.2d 829. As discussed in more detail in our discussion of the State's arguments, the corollary to this principle is that, although it is possible for individual pieces of evidence to permit an inference of deliberate intent, in many cases they must be analyzed in the context of other evidence. *Cf. Flores*, 2010-NMSC-002, ¶ 24 (discussing the "totality of the evidence in [the] record"); *Vigil*, 2010-NMSC-003, ¶ 18 (analyzing the state's evidence "individually or collectively").

### 3. The State Failed to Present Evidence That Defendant Acted Willfully, Deliberately, and With Premeditation

**{22}** We now assess the sufficiency of the evidence of deliberate intent in light of the foregoing discussion. The State contends that evidence of Defendant's premeditated and deliberate intent to kill Alexander may be inferred from (1) Defendant's alleged motive to kill Alexander; (2) Defendant's "arrival at the scene with a weapon"; (3) Defendant's "demeanor and conduct after the killing"; and (4) the number of shots fired. After careful examination of the evidence in the light most favorable to the State, we conclude that an inference of deliberate intent does not follow from the evidence and that the jury would have had to speculate in order to reach that conclusion. "This it may not do." *Vigil*, 2010-NMSC-003, ¶ 20 (internal quotation marks and citation omitted).

**Motive to Kill**

**{23}** The State argues that the jury could have reasonably inferred that Defendant had a motive to kill Alexander based on (1) Defendant's knowledge of Royal's previous conflict with Alexander, or (2) Defendant's "personal animus" toward Alexander based on their

7

membership in rival gangs. *See Rojo*, 1999-NMSC-001, ¶ 24 (concluding that the physical evidence supported deliberate intent "[w]hen combined with the evidence concerning [the d]efendant's motive for the killing); *State v. Motes*, 1994-NMSC-115, ¶ 14, 118 N.M. 727, 885 P.2d 648 (considering evidence of motive in assessment of whether the defendant had a deliberate intent to kill). But there was no evidence indicating that Defendant knew of Royal's conflict with Alexander, had his own conflict with Alexander, or was a member of a gang. Indeed, Alexander testified that he and Defendant never had any conflict and that he could think of no reason Defendant would have to shoot at him. Royal testified that Defendant knew that Royal was in a gang, but also stated that he could not say whether Defendant knew that Royal had a conflict with Alexander.

{24}    Although the State cites to several cases in which the New Mexico Supreme Court held that an inference of motive may be drawn from past conflict, each of these cases is inapposite because, in those cases, there was evidence that the defendant himself had a history of conflict with the victim. *See State v. Coffin*, 1999-NMSC-038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (stating that the defendant shot the victim after the victim witnessed the defendant shoot the victim's father) *Rojo*, 1999-NMSC-001, ¶ 22 (stating that recent termination of relationship between the defendant and the victim provided evidence of motive); *State v. Salazar*, 1997-NMSC-044, ¶¶ 4, 46, 123 N.M. 778, 945 P.2d 996 (stating that the victim and the defendant had a "troubled" relationship and the defendant "pursued" the victim just before the killing); *Motes*, 1994-NMSC-115, ¶ 14 (stating that the defendant was "distraught about the breakup of a lengthy marriage" and did not dispute that there was sufficient motive). To conclude, as the State argues, that Defendant formed a deliberate intent to kill Alexander based on Royal's gang membership and past conflict with Alexander requires at least two inferences. The first is that Royal's previous conflict with Alexander and/or gang affiliation gave Royal a motive to kill Alexander. The second is that Defendant knew of Royal's motive and would act based on that knowledge. While "[i]t is true that [the] plaintiff is entitled to [resolution of] all inferences in [its] favor[,] such inferences must be reasonably based on facts established by the evidence, not upon conjecture or other inferences." *Hisey*, 1967-NMSC-081, ¶ 7; *cf. State v. Trujillo*, 2002-NMSC-005, ¶ 58, 131 N.M. 709, 42 P.3d 814 (acknowledging "the danger of 'guilt by association' when evidence of gang membership is introduced"); *State v. Torrez*, 2009-NMSC-029, ¶¶ 26, 32, 146 N.M. 331, 210 P.3d 228 (stating that "we are especially wary of the threat of guilt by association [where the d]efendant's intent was the primary issue to be resolved at trial" and holding that the value of testimony on a gang's practices "was outweighed by the danger of unfair prejudice [in part] because there was no evidence presented at trial that [the d]efendant was a gang member at the time of the shooting"). We conclude that the evidence establishing Royal's previous conflict with Alexander and gang membership is insufficient to prove that Defendant had a motive to kill Alexander.

**Arrival at the Hall With a Weapon**

{25}    The State maintains that Defendant's "arrival at the scene [of a shooting] with a weapon" is evidence of planning that supports a conclusion that he formed a deliberate intent

to kill Alexander. It analogizes the facts here to three cases in support of this argument. In *State v. Manus*, the defendant became angry when his wife was stopped by police on the street near their house, went inside to get his gun, and returned to shoot two officers, killing one. 1979-NMSC-035, ¶¶ 3, 10, 93 N.M. 95, 597 P.2d 280 ("[The defendant's] statement that he got angry when the police stopped his wife is evidence of motive. His statement that he went and got his gun, and the testimony of shotgun shells loose on his table next to boxes of shells, is evidence which the jury could infer manifested a plan or design."), *overruled on other grounds by Sells v. State*, 1982-NMSC-125, 98 N.M. 786, 653 P.2d 162. In *State v. Lucero*, the defendant took a loaded gun to a methadone clinic where his wife was receiving treatment and shot two people, one of whom he suspected of being a police informer. 1975-NMSC-061, ¶ 7, 88 N.M. 441, 541 P.2d 430. The defendant himself was not being treated by the clinic. *Id.* Both *Manus* and *Lucero* are distinguishable from this case because in both cases there was evidence that the defendant had a motive to kill *before* he obtained the weapon. The defendant in *Manus* sought out and loaded his gun only after he became angry about his wife's detention by police. 1979-NMSC-035, ¶¶ 3, 10. Similarly, in *Lucero*, the defendant suspected the decedent of being an informant before he took the gun to the clinic. 1975-NMSC-061, ¶ 7. Thus, in those cases, the presence of the weapons was evidence of the defendants' intent to act on their motives. In contrast, here, as discussed, there was no evidence that Defendant had a motive to kill Alexander when he decided to carry the gun.

**{26}**     Furthermore, the specific circumstances here, without evidence of motive, do not permit an inference that Defendant planned to kill Alexander when he carried the .38 revolver to the hall. *State v. Leyba*, the third case on which the state relies, provides an example. 2012-NMSC-037, ¶¶ 2, 6, 289 P.3d 1215. In that case, the defendant, a security guard, shot and killed his girlfriend and her father and was convicted of first degree murder and felony murder. *Id.* The Supreme Court reversed on the ground that the girlfriend's diary had been improperly admitted at trial. *Id.* ¶ 45. The Court further determined that admission of the diary was not harmless error, since without it "the [prosecution] could offer only loosely circumstantial evidence to create an inference of willful deliberation." *Id.* ¶ 32. The Court rejected the prosecution's argument that the fact that the defendant brought his gun to the victims' apartment indicated a plan to kill them, stating that "[the d]efendant . . . regularly carried a gun while at work, and he was on break from work when he went to [the scene] . . . . Obviously, [the d]efendant's possession of the gun is still relevant. Its probative value, however, is diminished by the specific circumstances of the case." *Id.* ¶ 33. In other words, in the context of the defendant's normal practice to carry a gun while on break from work, the mere presence of the weapon was insufficient to demonstrate a willful and deliberate intent to kill the victims. *Id.*

**{27}**     Here, the probative value of the fact that Defendant was carrying a .38 revolver is similarly diminished by the circumstances of this case. Defendant does not dispute that he was carrying the revolver when he went to the hall. Thomas testified that he and Defendant had recently completed a concealed weapon permit class. Defendant therefore had a legal right to carry the weapon. *See* U.S. Const. amend II. Royal testified that he "always had a gun." The testimony indicated that other guests were carrying weapons and police found

9

five Federal brand casings at the scene that were not fired by either the semiautomatic .40 pistol or the .38 revolver, indicating at least one other weapon was fired there. Indeed, the party organizers had arranged for guests to be searched for weapons before entering the hall, indicating that they anticipated people would be carrying weapons to the party. In this context, the fact that Defendant was also carrying a weapon is not enough evidence from which to infer that he planned to kill Alexander that night.

**Conduct After the Shooting**

**{28}** The State also argues that "[l]ooking further to [the] totality of the evidence, the jury could infer Defendant intended to kill . . . Alexander from Defendant's demeanor and conduct after the [attempted] killing." *See Flores*, 2010-NMSC-002, ¶ 23 ("Not only may [the d]efendant's acts before and during the crime provide evidence of intent, evidence of flight or an attempt to deceive the police may prove consciousness of guilt." (internal quotation marks and citation omitted)). It points to evidence that Defendant fled from the scene, hid the semiautomatic .40 pistol in a closet, lied to the police about the incident, and told Thomas not to talk about what happened. It also asserts that Defendant's statements to the effect that he had shot Alexander one time could be reasonably interpreted by the jury to indicate intent. Even viewing this evidence in the light most favorable to the verdict, we are unpersuaded that this evidence supports the attempted first degree murder verdict because this evidence tells us nothing about Defendant's state of mind *before* the shooting, which is the central inquiry of a crime based on premeditation.

**{29}** First, Defendant was shot at as he ran away from the hall. Under these circumstances, assigning some further reason or significance to Defendant's flight amounts to pure speculation. Second, even if Defendant hid the gun, lied to police, or told Thomas not to talk, these factors, while potentially indicative of a consciousness of guilt as to some involvement in the shooting, are not indicative of Defendant's state of mind before the shooting. *See Garcia*, 1992-NMSC-048, ¶ 31 (holding that the defendant's attempt to conceal his identity from police "did not give rise to any inference as to his state of mind *before* the [killing]").

**{30}** Similarly, Defendant's statements that he shot Alexander one time do not indicate his state of mind before the shooting. They simply indicate that he shot at Alexander at least one time. Statements like this that indicate only that a shooting occurred cannot serve as the basis for an inference about whether Defendant premeditated the shooting. *See Adonis*, 2008-NMSC-059, ¶¶ 4, 25 (stating that the defendant's statement that shooting the victim "will teach this guy a lesson not to park in my place no more" was "insufficient on its own to prove deliberation" absent corroborative evidence that the defendant "actually deliberated" before shooting the victim (internal quotation marks omitted)); *Garcia*, 1992-NMSC-048, ¶ 32 (holding that the defendant's statement that he would kill the victim again "does not show that [the defendant] deliberated and intended to kill his victim before the [killing]"); *Taylor*, 2000-NMCA-072, ¶ 22 (stating that the defendant's admission to police that he shot the victim was not evidence of his deliberate intent to do so where "[w]e have

no statements before the shooting that he wanted to kill [the victim] or wished her dead").

**{31}** The State relies on *State v. Duran* for the proposition that intent may be inferred from post-killing statements by a defendant. *See* 2006-NMSC-035, ¶ 9, 140 N.M. 94, 140 P.3d 515 ("[T]he statements made by [the d]efendant would also support a jury's finding that the killing was deliberate" where the defendant admitted killing the victim). But the statements in *Duran* were not evidence of intent simply because the defendant admitted the killing. Rather, it was the content of the statements—"[I] straight up murdered some bitch"—that supported the jury's finding of deliberate intent because the statements evinced the defendant's attitude toward the victim. *Id.* The Court held that the jury could infer deliberate intent from the *combination* of the defendant's attitude and the prolonged nature of the attack. *Id.* ("When combined with evidence of [the d]efendant's attitude toward the victim, this evidence is sufficient to support the jury's finding that the murder of the victim was done with deliberate intent."). In contrast, Defendant's statements tell us nothing about his attitude toward Alexander or his state of mind before the shooting. Thus, there is no basis in Defendant's post-incident statements from which to draw an inference that Defendant formed a deliberate intent to kill Alexander.

**Number of Shots Fired**

**{32}** The State next argues that the fact that Alexander was shot five or six times supports an inference that Defendant acted willfully and deliberately and points to cases in which evidence that a shooter continued to attack the victim after the victim was incapacitated or began leaving the scene supported an inference of intent to kill. *See, e.g.*, *State v. Riley*, 2010-NMSC-005, ¶ 20, 147 N.M. 557, 226 P.3d 656 (deliberate intent supported where the defendant "first shot from about thirty-eight feet away and then ran towards [the v]ictim and fired four or five more shots. [The d]efendant fired two of the shots from less than four inches from [the v]ictim's body and then shot [the v]ictim one final time as [the v]ictim was attempting to escape from the car"), *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, 306 P.3d 426; *State v. Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P.3d 32 (stating that "a reasonable jury could determine that [the d]efendant intended to kill [the victim] when he went to [the victim's] home armed with a gun, waited for him to arrive, and then shot the unarmed victim numerous times" and that "[it] also could have found that [the d]efendant formed the deliberate intent to kill [the victim] during the time between shooting him in the face on his porch and pursuing the wounded and defenseless victim into the street and shooting him from behind"); *State v. Cunningham*, 2000-NMSC-009, ¶¶ 2, 28, 128 N.M. 711, 998 P.2d 176 (stating that the defendant shot at the victim multiple times with one gun, then obtained another gun from his car and fired the fatal shot with it "after [the victim] was incapacitated and defenseless"); *Coffin*, 1999-NMSC-038, ¶¶ 5, 76 (stating that the defendant shot the victim four times in the back after the victim had turned to get in his car as the defendant requested); *State v. Garcia*, 1980-NMSC-141, ¶ 4, 95 N.M. 260, 620 P.2d 1285 (stating that the defendant shot the victim after the victim had turned to run away).

11

**{33}** We reject the State's argument. Careful review of these cases reveals that the number of shots fired takes on significance only in the context of other evidence of intent. For instance, in *Garcia*, the "[d]efendant admitted that he had accomplished his purpose of warning or scaring the deceased before he aimed and fired" and before he fired, the defendant "looked at the bottom of the gun, held his arms up with the gun straight out in both hands, crouched a bit, hesitated a moment[,] and then fired toward the deceased." 1980-NMSC-141, ¶ 4. In *Coffin*, a witness testified that the defendant had told him that he had killed the victim because the victim had seen him kill another person. 1999-NMSC-038, ¶ 76. In *Cunningham*, there was testimony that there was "a volley of . . . seven or eight shots[,]" a pause, then "one other distinct shot," as well as evidence that the defendant had threatened the victim. 2000-NMSC-009, ¶¶ 6, 28, 29.

**{34}** The importance of analysis of the number of shots in conjunction with the totality of the circumstances was highlighted in *Tafoya* and *Adonis*. In *Tafoya*, the defendant had been drinking and taking drugs with the victims before he, "without any evidence of motive, shot [one victim] and then in very quick succession shot [the other victim]." 2012-NMSC-030, ¶ 46. The defendant fired five times, possibly pausing between the fourth and fifth shots. *Id.* ¶ 47. Although the state argued that the defendant formed an intent to kill the second victim "in order to eliminate a potential eyewitness" to the first killing, *id.* ¶ 48, the Court held that there was insufficient evidence to support attempted first degree murder because while "the law allows for a jury to infer that a short amount of time can be sufficient to form deliberate intent," there was no evidence that deliberate intent was in fact formed. *Id.* ¶ 54. Similarly, in *Adonis*, the defendant fired multiple shots at the victim, who was getting out of a car. 2008-NMSC-059, ¶ 4. The Court held that "multiple shots . . . alone do[] not indicate that [a d]efendant deliberated before shooting [the v]ictim" and contrasted the *Adonis* facts with those in *Sosa* and *Duran*, in which there were other "details reflecting on the accused's state of mind." *Adonis*, 2008-NMSC-059, ¶¶ 23, 24. Since in *Adonis* such other evidence was lacking, the Court held that the evidence of multiple shots was insufficient to demonstrate deliberate intent. *Id. But see State v. Jett*, 1991-NMSC-011, ¶ 10, 111 N.M. 309, 805 P.2d 78 ("Regardless of what happened at the time of the first shot, . . . once [the victim] was wounded [the defendant] then fired two additional shots into her head, chest, or abdomen. Therefore, even if he had fully established his struggle contention, [the defendant's] admission to the subsequent shots convincingly supports the verdict of first degree murder.").

**{35}** The State devotes a substantial portion of its brief to discussion of the number of possible shots that could have been fired by the semiautomatic .40 pistol carried by Royal and the .38 revolver carried by Defendant. The State argues that "[t]he evidence demonstrates . . . Royal could have fired no more than twice at . . . Alexander, and that one of those bullets may have struck the pavement rather than . . . Alexander. From this, it is apparent that . . . possibly five of the bullets that struck . . . Alexander were fired by Defendant." The State's analysis depends on a number of presumptions and inferences. Even if we accept the State's assertions, however, when considered in context, the number of shots in this case is not indicative of deliberate, premeditated intent to kill. There is no

dispute that Royal was engaged in a fistfight near the hall entrance, that others were also fighting nearby, that Defendant went toward the entrance after learning that Royal was fighting, that someone not engaged in the fight fired a gun into the air, and that thereafter multiple shots were fired. Royal testified that, upon hearing the first shot, he believed he had been shot and immediately began shooting Granville. He agreed with defense counsel that all of the shooting occurred very quickly. Alexander also agreed that he heard ten to fifteen shots fired very quickly. One witness stated there were six or seven shots, and another testified that the shots sounded "like fireworks." Thomas testified that there were "at least a dozen" shots from multiple guns which "rang out" right after the first shot was fired into the air. In the context of this melee, and without other evidence of Defendant's state of mind, the number of shots fired is insufficient to support an inference that Defendant deliberated before shooting Alexander.

**{36}** In summary, when considered individually and collectively and in the context of the "heightened burden" on the prosecution to prove a willful, deliberate, and premeditated killing, the state's evidence in this case is insufficient to sustain an inference of deliberate intent beyond a reasonable doubt. *See Adonis*, 2008-NMSC-059, ¶ 14.

**Double Jeopardy Bars Retrial**

**{37}** Since we conclude that the evidence was too speculative to support the jury's verdict, we next examine whether to remand for entry of judgment on attempted second degree murder, as the State requests, or for a new trial. We conclude that remand for resentencing for attempted second degree murder is inappropriate here. We further conclude that retrial of Defendant for attempted second degree murder would violate his right to be free from double jeopardy. We explain.

**{38}** Generally, "appellate courts have the authority to remand a case for entry of judgment on the lesser included offense and resentencing rather than retrial when the evidence does not support the offense for which the defendant was convicted but does support a lesser included offense." *State v. Haynie*, 1994-NMSC-001, ¶ 4, 116 N.M. 746, 867 P.2d 416; *see Tafoya*, 2012-NMSC-030, ¶ 35 (stating that attempted second degree murder is a lesser included offense of first degree murder); § 30-2-1(B) ("Murder in the second degree is a lesser included offense of the crime of murder in the first degree."). In *State v. Villa*, however, the Supreme Court declined to extend the so-called "direct remand" rule to those cases where a conviction is reversed based on insufficient evidence to support the greater charge and the jury had not been instructed on the lesser included offense. 2004-NMSC-031, ¶¶ 12-13, 136 N.M. 367, 98 P.3d 1017. It held that the direct remand rule did not apply under these circumstances "because a conviction of an offense not presented to the jury would deprive the defendant of notice and an opportunity to defend against that charge and would be inconsistent with New Mexico law regarding jury instructions and preservation of error." *Id.* ¶ 1.

**{39}** Here, the State did not request an instruction on attempted second degree murder.

13

In charging and instructing only on attempted first degree murder, the State apparently "pursued an 'all-or-nothing' trial strategy," a tactical decision we do not second-guess on appeal. *Id.* ¶ 14. Hence, direct remand for resentencing is not appropriate.

**{40}** Neither is a new trial. "Where a defendant successfully challenges his or her conviction on some basis other than insufficiency of the evidence, double jeopardy does not apply." *State v. Gonzales (Gonzales I)*, 2011-NMCA-081, ¶ 34, 150 N.M. 494, 263 P.3d 271 (alteration, internal quotation marks, and citation omitted), *aff'd on other grounds,* 2013-NMSC-016, 301 P.3d 380; *see* U.S. Const. amend. V; N.M. Const. art. II, § 15. But because here we hold that the State's evidence was insufficient to support a conviction for attempted first degree murder, double jeopardy applies. "The Double Jeopardy Clause protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense." *State v. Gonzales (Gonzales II)*, 2013-NMSC-016, ¶ 15, 301 P.3d 380 (internal quotation marks and citation omitted). The prohibition includes "successive prosecutions for two offenses arising out of the same conduct if either one is a lesser[]included offense within the other." *State v. Meadors,* 1995-NMSC-073, ¶ 5, 121 N.M. 38, 908 P.2d 731. In cases such as this one, "reversal of the greater offense . . . for insufficient evidence would also . . . 'bar a subsequent indictment on the implicit lesser included offenses' that were never presented to the jury." *Gonzales II*, 2013-NMSC-016, ¶ 19 (alterations omitted) (quoting *United States v. Gooday,* 714 F.2d 80, 82 (9th Cir. 1983)).

**{41}** The State argues that dismissal of the charges against Defendant is improper because "the physical evidence presented at trial clearly established 'Defendant knowingly created a strong probability of death or great bodily injury[,]' the standard for establishing the offense of attempted second[]degree murder." *See* § 30-2-1(B). It is possible that the evidence supports a conviction for attempted second degree murder. Nevertheless, the State pursued a trial strategy that did not include this charge. "As our courts have stated many times, the parties should be liable for the risks of their respective trial strategies. To do otherwise would be to violate the very essence of fairness at the core of the Double Jeopardy Clause." *Gonzales I*, 2011-NMCA-081, ¶ 38 (internal quotation marks and citation omitted); *see Gonzales II*, 2013-NMSC-016, ¶ 33 (stating that "[tactical] decisions have consequences"). We hold that since attempted second degree murder is a lesser included offense of attempted first degree murder and there was insufficient evidence of the greater offense, Defendant may not be retried for attempted second degree murder.

## CONCLUSION

**{42}** For the foregoing reasons, we reverse Defendant's conviction and remand to the district court to vacate his sentence.

**{43}    IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

_____

**JONATHAN B. SUTIN, Judge**