This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-41450**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DONALD DUQUETTE,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Courtney Weaks, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

### MEMORANDUM OPINION

**DUFFY, Judge.**

**{1}** This matter was submitted to this Court on Defendant's brief in chief pursuant to the Administrative Order for Appeals in Criminal Cases from the Second, Eleventh, and Twelfth Judicial District Courts in *In re Pilot Project for Criminal Appeals*, No. 2022-002, effective November 1, 2022. Following consideration of the brief in chief, this Court

assigned this matter to Track 2 for additional briefing. Now having considered the brief in chief, answer brief, and reply brief, we affirm for the following reasons.

**{2}** Defendant appeals from the district court's judgment and sentence for second degree murder following a jury trial. [2 RP 449-55] Defendant contends that the district court abused its discretion by failing to strike two jurors for cause [BIC 8-17; RB 1-7] and there was insufficient evidence supporting his conviction because the State failed to prove that he did not act in self-defense. [BIC18-24; RB 7-9]

## I.      Juror Challenges

**{3}** "Our standard of review of the district court's refusal to excuse a juror for cause is for abuse of discretion." *State v. Medema*, 2025-NMCA-011, ¶ 9, ___ P.3d ___. "We will find an abuse of discretion in failing to excuse a juror only when the district court acts in an obviously erroneous, arbitrary or unwarranted manner by failing to excuse a juror who could not be impartial." *Id.* Defendant alleges that both jurors should have been stricken for cause because each juror's statements amounted to actual bias. [BIC 9-10; RB 1] "Actual bias is bias in fact, or the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *State v. Holtsoi*, 2024-NMCA-042, ¶ 6, 547 P.3d 770 (internal quotation marks and citation omitted). Here, because Defendant used all of his peremptory challenges before the jury was seated [BIC 8; AB 5], Defendant "has made a sufficient showing of harm to require remand for a new trial if the district court's denial of excusal for cause was an abuse of discretion." *Medema*, 2025-NMCA-011, ¶ 8

### A.      Juror 13's Statements

**{4}** During the State's portion of voir dire, the State asked jurors questions about the type of evidence they would anticipate during a homicide trial and its relation to the State's burden of proof. [1-23-2023 CD 11:26:54] Juror 13 responded by stating the types of evidence he would expect to see to find Defendant guilty beyond a reasonable doubt: "I would expect to see hard evidence, such as wounds to any victim, or injuries that caused the death. I would expect to have information on weapons, prospective weapons causing—involved in a homicide. And any information possible about these circumstances and the environment in which it occurred," and additionally emphasized the importance of the circumstances surrounding the crime. [*Id.* 11:37:26-38:26]

**{5}** During defense counsel's questioning about post-traumatic stress disorder and the need for treatment [1-23-2023 CD 2:38:38], Juror 13 stated in response: "I think [the effects] can likely linger or can occur over time." [*Id.* 2:40:10-17] Defense counsel then followed up with questions about Juror 13's juror questionnaire and his previous experience as an expert witness:

> Defense: you had mentioned on your special questionnaire that as a result of your experience in[], as an expert witness, that you are—and I'm just reading from your questionnaire—you are biased against experts?

Juror 13: Yes, my experience [] taught me that to this day I think most expert witnesses can be bought. And I suspect the more they do it the more prone they become.

Defense: And you, you would stand by that feeling even in this trial, correct?

Juror 13: Sure, yes.

[*Id.* 2:40:36-41:06] Defendant, the State, and the district court did not ask further follow up questions. [BIC 11]

**{6}** Defendant contends that Juror 13's statement that he is "biased" against expert witnesses and the district court's failure to ensure impartiality amounts to actual bias [BIC 15-16; RB 2-6], although Defendant admits that Juror 13's use of the word "bias" does not establish actual bias alone. [RB 2]

**{7}** We disagree that Juror 13's statement was comparable to a clear statement of an inability to be fair and impartial in light of Juror 13's other statements about holding the State to its burden of proof. A juror does not need to unequivocally state they would be able to put aside their experience and be fair and impartial. *See Medema*, 2025-NMCA-011, ¶ 13. Rather, Juror 13's statement about expert witnesses references his own life and work experience. "[A]ll jurors have experiences that influence their view of the evidence, and these experiences are not inherently disqualifying." *Id.* ¶ 16 (internal citations omitted). "[R]equiring a juror to purge their mind of all experiences and opinions is psychologically impossible," and "[t]he presumption is that each prospective juror can be fair and impartial, despite experiences in their past." *Id.* ¶ 14 (alterations, quotation marks, and internal citations omitted).

**{8}** Unlike the juror at issue in *Holtsoi*—which Defendant cites in support—Juror 13's statement is not an "unequivocal insistence that he could not be fair and impartial." *Medema*, 2025-NMCA-011, ¶ 13 (citing *Holtsoi*, 2024-NMCA-042, ¶ 10); *see also id.* ¶¶ 13-15 (discussing this Court's decision in *Holtsoi*). In contrast, Juror 13's responses to other questions during voir dire "revealed an ability and a willingness to listen to the evidence and make a decision based on that evidence." *Id.* ¶ 15. Given these answers, we cannot say that the district court abused its discretion in denying Defendant's motion to strike Juror 13 for cause. *See id.* ¶ 9.

## B.   Juror 15's Statements

**{9}** During the State's questioning about the burden of proof and expected evidence [1-23-2023 CD 11:26:54], Juror 15 responded, "I guess it's all circumstantial and it would all just depend on what evidence is presented to put together yourself to make a decision," and "[i]f there's no witnesses, you're going to base it off of what you physically see in the photographs and how that aligns with each individual's testimony and if it aligns or not. But it's all going to be based off what is presented to you in the situation."

[*Id.* 11:35:51-36:13] After a follow up question from the State about motive, Juror 15 stated, "[T]hat's going to be true for any case, no matter what a situation is. Going back to what one of the jurors said on not knowing what somebody did or why they did it, it's the facts of what happened in that moment that you have to look at." [*Id.* 11:36:13-36:44]

{10}    The parties then asked Juror 15 questions privately about her juror questionnaire answer about whether Juror 15 could serve fair and impartially. Juror 15 wrote "Possibly. Shooting from a vehicle already makes me believe it was not a defense type of situation." [*Id.* 2:57:25-58:00] Juror 15 explained

> I'm extremely objective, and it was difficult for me to put an honest answer with few words. . . . Not knowing any details, honestly, it . . .  just doesn't sound like there was any immediate, anything against it. But again, the information I'm given is very limited, so I have no idea of the context behind any of it. And the way the questionnaire is written out is that it was a shooting from a vehicle, but there was no context of what's coming back. I like to see everything objectively. I am personally a concealed and carry gun owner. I believe in the rights of having it for self-defense, but I also do believe that you need to go through every possible force before you get to that aspect. So when I have very limited information coming back as to what he may have been facing, it's hard for me to be objective, if that makes sense. So I'd have to have more information to answer that a hundred percent.

[*Id.* 2:58:00-59:15] Juror 15 then concluded that she stood by what she had written in her questionnaire to defense counsel's questions. [*Id.* 2:59:15-59:30]

{11}    Defendant contends that Juror 15 should have been stricken for cause because the district court did not verify whether she could be objective in relation to Defendant's theory of self-defense. [BIC 16-17; RB 6-7] We disagree. As previously stated, a juror does not need to "unequivocally state" that they will be fair and impartial. *See Medema*, 2025-NMCA-011, ¶ 13. Even assuming that Juror 15's statement calls into question her ability to be impartial, Juror 15's additional, repeated statements about her objectivity and need to see the surrounding circumstances of the case were sufficient to cure any perceived bias. "When a potential juror makes a statement during voir dire, or alludes to a past experience or circumstance, that either directly or impliedly calls into question his or her ability to faithfully serve on the jury, a prior or subsequent unequivocal statement indicating such person's ability to remain fair and impartial is generally sufficient to uphold the trial court's exercise of discretion to deny motions to strike for cause." *Holtsoi*, 2024-NMCA-042, ¶ 11. Here, Juror 15's additional statements illustrated a willingness to listen to the evidence presented at trial and base her decision upon that evidence. *See Medema*, 2025-NMCA-011, ¶ 15. Therefore, we cannot say that the district court abused its discretion by denying Defendant's motion to strike Juror 15 for cause. *See id.* ¶ 9.

## II.    Sufficiency of the Evidence

**{12}**    Defendant additionally argues that there was insufficient evidence supporting his conviction because the State failed to prove that he did not act in self-defense. [BIC 18-24; RB 7-9] "[A]ppellate courts review sufficiency of the evidence from a highly deferential standpoint." *State v. Slade*, 2014-NMCA-088, ¶ 13, 331 P.3d 930 (alteration, internal quotation marks, and citation omitted). "All evidence is viewed in the light most favorable to the state, and we resolve all conflicts and make all permissible inferences in favor of the jury's verdict." *Id.* (alterations, internal quotation marks, and citation omitted). "We examine each essential element of the crimes charged and the evidence at trial to ensure that a rational jury could have found the facts required for each element of the conviction beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). "[A]ppellate courts do not search for inferences supporting a contrary verdict or re[]weigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury." *Id.* (internal quotation marks and citation omitted).

**{13}**    We look to the jury instructions to determine what the jury was required to find in order to convict Defendant beyond a reasonable doubt. *See State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 ("The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (alterations, internal quotation marks, and citation omitted)). In relevant part, the jury instructions for second degree murder required the State to prove beyond a reasonable doubt that (1) "[D]efendant killed [Victim]"; (2) "[D]efendant knew that his acts created a strong probability of death or great bodily hard to [Victim]"; and (3) "[D]efendant did not act in self[-]defense." [2 RP 395] The jury was further instructed that Defendant acted in self-defense if (1) "There was an appearance of immediate danger of death or great bodily harm to [D]efendant as a result of [Victim]'s erratic driving"; (2) "[D]efendant was in fact put in fear of immediate death or great bodily harm and discharged a firearm at [Victim]'s car because of that fear"; (3) "The apparent danger would have caused a reasonable person in the same circumstances to act as [D]efendant did"; and (4) the State proved beyond a reasonable doubt that Defendant did not act in self-defense. [2 RP 408]

**{14}**    According the Defendant's brief in chief the following material evidence was presented at trial. [BIC 5] On the night of the shooting, Defendant went to his friend Mark's home to pick up another friend, Haggerty, who claimed that a third individual, Kessler, had struck her. [BIC 5] Mark had asked Defendant to pick up a package for him from downtown, but Defendant "got spooked" and believed that his friend's associates "might be after him," so he stopped by his house to arm himself with several guns, live ammunition, and a bullet-proof vest. [BIC 5]

**{15}**    At around 2:00 a.m., Defendant had Haggerty drive his roommate's car—which had been left at Mark's home earlier that day—to a separate location where Defendant would pick up Haggerty and take her to a hotel for the night so that Kessler would not know where Haggerty was staying for the night. [BIC 5] However, Haggerty turned eastbound onto the freeway and not westbound as Defendant and Haggerty had

discussed. [BIC 6] Defendant believed that Haggerty had "freaked out" because Defendant had seen a beat-up white van driving erratically. [BIC 6] Defendant believed that the white van was Kessler, and that Kessler "may have been coming after [Haggerty]." [BIC 6]

**{16}**   As Defendant entered the freeway on ramp, he followed Haggerty as she merged lanes to the left trying to signal to Haggerty to take the next exit off the freeway. [BIC 6] According to Defendant, a white truck, driven by Victim, suddenly appeared beside Defendant on his right that was driving aggressively at the same time that Haggerty merged into the right lane. [BIC 6] Defendant believed that the white truck was attempting to push him out of the lane and Defendant veered toward the white truck to "cut it off." [BIC 6] Defendant then saw Victim raise something that Defendant believed was a gun, thought he heard an impact and saw a flash, grabbed his own gun, and "just started firing through his passenger-side window" [BIC 6] because Defendant believed Victim was attempting to shoot either himself or Haggerty. [BIC 21] Defendant told police that he struggled with post-traumatic stress disorder from his time as a paramedic [BIC 5] and that he "felt like I was fighting for my life" when the white truck came up beside him. [BIC 6]

**{17}**   Victim was killed and his white truck was left on the side of the freeway. [BIC 2] A crime scene specialist noted four apparent bullet marks on the outside of the white truck and found five spent bullet casings inside Defendant's truck with a bullet lodged in the passenger-side door. [BIC 4] A ballistics analyst testified that the bullet casings did not match the two guns found in the car [BIC 4], but a third gun that Defendant testified he lost out his passenger side window that shattered when Defendant fired on the white truck. [BIC 6]

**{18}**   The State additionally presented evidence that Defendant believed that he was being followed, and that Defendant was feeling "paranoid" and that "something was going to happen" because of the package Mark asked him to pick up. [State's Exh. 5A, 22:56-28:56] Further, there were no bullet marks found on Defendant's truck [State's Exh. 38-40], and there were no weapons or spent bullet casings found in Victim's truck. [1-26-2023 CD, 1:22:50-23:40]

**{19}**   Based on these facts and Defendant's statements presented at trial, we conclude that there was sufficient evidence for the jury to conclude that Defendant did not act in self-defense. Defendant argues that other evidence presented at trial established that Defendant held a genuine belief that he needed to defend himself and that his response was objectively reasonable—Victim's blood alcohol level and blood test showing cocaine, damage to Defendant's vehicle with white paint transfer, the short period of time the events took place, and the inherent danger of Victim's aggressive driving. [BIC 21-24, RB 9] Defendant's argument is an invitation for this Court to reweigh the evidence presented at trial. We decline to do so. "This [C]ourt does not weigh the evidence and may not substitute its judgment for that of the fact[]finder so long as there is sufficient evidence to support the verdict." *State v. Griffin*, 1993-NMSC-071, ¶ 17, 116 N.M. 689, 866 P.2d 1156 (internal quotation marks and citation omitted). Rather, it is for

the jury to resolve any conflicts and determine the weight and credibility of the testimony. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Therefore, viewing the evidence in the light most favorable to the state and resolving all conflicts and making all permissible inferences in favor of the jury's verdict, we hold that there was sufficient evidence to establish that Defendant did not act in self-defense. *See Slade*, 2014-NMCA-088, ¶ 13.

**{20}** For the foregoing reasons, we affirm.

**{21}** **IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**KATHERINE A. WRAY, Judge**