This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: February 11, 2016**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**                                                   **NO. S-1-SC-35291**

**DEANDRE GONZALES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Templeman & Crutchfield
C. Barry Crutchfield
Lovington, NM

for Appellant

Hector H. Balderas, Attorney General
Tonya Noonan Herring, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Chief Justice.**

{1}     Defendant appeals his conviction for first-degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994). Defendant challenges his conviction on three grounds, arguing that: 1) there was insufficient evidence to support a verdict of first-degree murder because his conduct was not willful, deliberate and premeditated, 2) the trial court erred by refusing to give a jury instruction on self-defense, and 3) the evidence presented by the State demands this Court enter a verdict of voluntary manslaughter.

{2}     We reject each of Defendant's claims of error and affirm his conviction for first-degree murder. We proceed to render this non-precedential decision because settled New Mexico law controls each of the issues Defendant raises in his capital appeal. *See* Rule 12-405(B)(1) NMRA.

## I.     BACKGROUND

{3}     Defendant Deandre Gonzales shot and killed sixteen-year-old Victim in Hobbs, New Mexico on May 29, 2014. Defendant was charged with first-degree murder, found guilty by a jury of first-degree murder, and then sentenced to life imprisonment. The killing occurred outside of a music video store and popular teen hangout called "The Shop," where a number of people had gathered to film a music video. Witnesses

testified at trial that Victim and his friends went to "The Shop" after being notified about the filming over Facebook. When Defendant and his girlfriend, Santana Serrano, showed up—after filming of the music video was completed, and thirty minutes after Victim had arrived—an argument broke out between Defendant and Victim. David Romero, the disc jockey that night, testified that Defendant walked into "The Shop" "like for an argument," and that he was looking "for a fight or something." As well, Romero found Defendant's attendance odd because he had not been invited.

{4} The verbal altercation between Defendant and Victim escalated, so they left "The Shop" and walked down the street, followed by a group of people, to fight. The fight was caught on two cell phone videos that were shown to the jury. At the beginning of one of the videos, Defendant gives a handgun to Serrano. The fight lasts a short period of time before Romero steps in to halt the altercation. The videos next show Defendant walk over to Serrano and take the gun, at which point there is an audible clicking sound as he loads a bullet into the chamber. That is, the gun was not readied for discharge until Defendant came into possession of it after the fight. Then, approximately six seconds after the fight ended, Defendant shoots Victim once in the head. Defendant and his girlfriend fled the scene by car, and no gun was recovered.

Only one 9mm shot casing was retrieved from the scene.

{5}    Victim's friends transported him to the hospital in the car of a witness that happened to be driving by the scene. Victim died from the gunshot wound to the head.

{6}    At trial, some witnesses testified that they believed there may have been two gunshots, although a second casing was never found. Conflicting witness testimony indicated a high propensity for echo on that particular street, and that only one shot was fired. A detective who interviewed Serrano testified that Serrano said she told Defendant she had heard a gunshot, and that only this caused Defendant to grab the gun. This is contradicted by the videos. The same detective testified that he believed that if Defendant had initially intended to kill Victim, the fighting would have been unnecessary.

{7}    Another detective, who interviewed Defendant post-arrest, testified that Defendant claimed Victim had used brass knuckles which knocked him out, leaving him with no recollection of the events following the fight. No brass knuckles were recovered, though, and other witnesses observed nothing in Victim's hands, calling it a fair fight. Defendant also said the altercation had something to do with a family conflict, as Victim's brother and Defendant's cousin were involved in a prior altercation. Defendant initially denied having the gun in that interview, but now

4

admits to the killing, and ultimately did tell the detective that he never intended to hurt Victim.

{8}    A third detective testified that he was informed about the problem between Victim and Defendant's families, and that following an investigation he did not believe that this was a killing perpetrated because Defendant had simply become angered with Victim after the fight. And, in the course of the investigation, none of the persons he interviewed could figure out why Defendant had gone to "The Shop" on that evening in the first place, and nobody had seen a second gun.

{9}    The trial court found that the majority of witness statements that there may have been two gunshots, and Serrano's statements that Victim was shooting, were offered only as evidence that police had notice of an alleged second shot in the course of their investigation. As such, they were not offered for the truth of the matter asserted, and were therefore not substantive evidence of the existence of a second shot. The trial court then denied Defendant's self-defense instruction because there was insufficient evidence of self-defense. The jury returned a verdict finding Defendant guilty of first-degree murder, and Defendant was sentenced to life imprisonment.

## II.    DISCUSSION

{10}    We now address each of Defendant's claims of error.

5

**A. There Was Sufficient Evidence of Deliberate Intent to Support the First-Degree Murder Verdict**

{11} Defendant first argues that the evidence presented by the State at trial is insufficient to support a conviction of willful, deliberate and premeditated first-degree murder. Instead, Defendant asserts that the evidence only supports a conviction for the lesser-included offense of voluntary manslaughter, arising from a sudden quarrel—in a heat of passion—pursuant to the fight in which Defendant and Victim were engaged prior to the killing. We disagree, and find that the evidence presented by the State was sufficient to support a verdict of first-degree murder with deliberate intent.

{12} "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). This jury was instructed on the elements of willful, deliberate, and premeditated murder under UJI 14-201 NMRA: "1. The [D]efendant killed Daniel Garcia; 2. The killing was with the deliberate intention to take away the life of Daniel Garcia; 3. This happened in New Mexico on or about the 29th of May, 2014."

{13} The element of willful, deliberate, and premeditated intent (deliberate intention) distinguishes first and second-degree murder. *State v. Tafoya*, 2012-NMSC-030, ¶ 37, 285 P.3d 604. Second-degree murder is a killing with knowledge that the killer's act

creates a strong probability of death or great bodily harm. NMSA 1978, Section 30-2-1(B). A first-degree murder occurs where the State proves that a killing was willful, deliberate and premeditated. *State v. Adonis*, 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P.3d 717. A second-degree murder can also be intentional, but lacks the deliberate intention element—that is, "if the State merely proves that the accused acted rashly or impulsively, rather than deliberately, and if the accused acted intentionally and without justification or provocation, then the facts would only support second-degree murder." *Id.* ¶ 16. An intentional killing with justification or adequate provocation constitutes voluntary manslaughter. NMSA 1978, § 30-2-3(A) (1994).

{14} Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and

inferences to the contrary." *Id.* (internal quotation marks and citation omitted).

{15} Deliberate intention for first-degree murder requires that the conduct was "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (quoting UJI 14-201 NMRA). The deliberate intention needed to prove a first-degree murder may be inferred from the facts and circumstances surrounding the killing. *Cunningham*, 2000-NMSC-009, ¶ 14. A jury can infer such deliberative, calculated intent from a deliberative process occurring over a short period of time. *Tafoya*, 2012-NMSC-030, ¶ 42.

{16} The juxtaposition of deliberation and a short time frame, Defendant argues, is hard to reconcile. *See Tafoya*, 2012-NMSC-030, ¶ 41 (stating that "[t]he notion that careful reasoning can occur in a short period of time seems somewhat counterintuitive, and . . . impulsive killings are far more likely to be the product of an expedited decision-making process than are carefully contemplated killings"). And that juxtaposition has not been ignored; in fact, the problem has been analyzed in New Mexico for over twenty years. *See, e.g.*, *State v. Slade*, 2014-NMCA-088, ¶ 19, 331 P.3d 930; *State v. Garcia*, 1992-NMSC-048, ¶ 30, 114 N.M. 269, 837 P.2d 862 ("But what is a 'short period of time'? A second or two? If so, then it is hard to see any

8

principled distinction between an impulsive killing and one that is deliberate and premeditated."); Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico*, 18 N.M. L. Rev. 73, 87 (1988) ("To engage in careful thought and to weigh the considerations for and against the proposed course of action that might result in a killing must involve the passage of time; otherwise, the formation of the intent to kill would be impulsive and rash." (footnote omitted)). Ultimately, *Tafoya* resolved the problem by "recogniz[ing] that it is possible in certain cases for a jury to reasonably infer from evidence presented that the deliberative process occurred within a short period of time—the crucial element being the presentation of other evidence." 2012-NMSC-030, ¶ 42 (emphasis omitted). That is, in those cases where a jury discerns a deliberate intention formed over a short period of time, there should be "evidence beyond the temporal aspect of the crime in order to find sufficient evidence of deliberation." *Id.* In this case, there exists sufficient evidence beyond the temporal aspect of the crime to support a jury's inference of deliberate intention.

{**17**}     Such "other" evidence of deliberate intention varies according to the unique circumstances of a given killing, but may include "the large number of wounds, the evidence of a prolonged struggle, the evidence of the defendant's attitude toward the

9

victim . . . the defendant's own statements," fleeing the scene, disposing of evidence, and concocting false alibis. *Flores*, 2010-NMSC-002, ¶¶ 21-22. This Court also looks for "evidence of earlier confrontation[s] . . . or other common areas of friction leading to violence." *Tafoya*, 2012-NMSC-030, ¶ 52.

{18} In *Garcia*, this Court found insufficient evidence to support a finding of deliberate intention where the defendant stabbed a victim in the midst of a fight. 1992-NMSC-048, ¶¶ 7, 28. While the fight was the second between the combatants that afternoon, and the defendant could conceivably have formed a deliberative intent to kill in between the two fights, there was no evidence that such deliberative intent had actually been formed. *Id.* ¶ 30. Importantly, in *Garcia*, the fight was inspired by heavy drinking and prolonged, escalating animosity, with the killing happening during the fight. *Id.* ¶¶ 3-9. There was no build-up of that sort in the instant case; the killing unfolded in less than an hour.

{19} In arguing against the existence of deliberative intent, Defendant asserts that no evidence exists to indicate 1) Defendant's knowledge of the presence of Victim at "The Shop" that night, 2) a history of conflict between Defendant and Victim, or 3) statements and threats by Defendant to Victim prior to arriving at "The Shop." Defendant primarily relies on the New Mexico Court of Appeals' opinion in *State v.*

10

*Slade*, 2014-NMCA-088, 331 P.3d 930, *cert. quashed* 2015-NMCERT-001 (N0. 34,764, Jan. 25, 2015). That case involved an attempted murder. *Id.* In *Slade*, the State argued that evidence of a defendant's deliberate intent to kill could be inferred from "(1) [d]efendant's alleged motive to kill [victim]; (2) [d]efendant's 'arrival at the scene with a weapon'; (3) [d]efendant's 'demeanor and conduct after the killing'; and (4) the number of shots fired." *Id.* ¶ 22. The Court of Appeals disagreed. Defendant references the four factors presented in *Slade*, and by analogy, attempts to distinguish the instant facts from a first-degree murder. However, the four factors in *Slade* are not exclusive in the deliberative intent inquiry—and, the facts of *Slade* differ starkly from those of the instant case.

{20}     In *Slade*, the defendant waited outside a crowded dance hall as a friend went inside to fight the eventual victims (one would die, and one would survive). *Id.* ¶ 3. The fight, and everyone in the dance hall, migrated outside, and in the confusion, defendant allegedly fired one shot that hit the surviving victim, as all the while shots were being fired by all parties involved. *Id.* ¶¶ 3-4, 6, 8. The State claimed motive to kill existed because the defendant's friend—who was actually confirmed to have fired shots that hit both victims—had a prior conflict with one victim, or alternatively, because of rival gang membership. *Id.* ¶ 23. From this evidence, the Court of Appeals

determined there could be no rational inference by a jury that the defendant himself had a motive to kill victims, particularly where the State's claims about prior conflict and gang membership were unsubstantiated. *Id.* ¶ 24. Plus, that prior conflict was actually only between the defendant's friend and the victims, and not the defendant himself. *Id.* ("Although the State cites to several cases in which the New Mexico Supreme Court held that an inference of motive may be drawn from past conflict, each of these cases is inapposite because, in those cases, there was evidence that the defendant himself had a history of conflict with the victim."). Regarding arrival at the dance hall with a weapon, the evidence in *Slade* indicated the defendant always carried a gun, causing the Court of Appeals to find mere possession inconsequential on the issue of deliberation. *Id.* ¶ 27.

{**21**}    In *Slade*, the State next unsuccessfully argued that an inference of deliberation could be drawn from the defendant's demeanor after the incident—the defendant fled the scene of the shooting, hid one of the weapons, lied to police about the incident, and urged the other parties to stay quiet. *Id.* ¶ 28. Yet, the Court of Appeals noted that the defendant was being shot at as he fled, and while the lies may very well have been indicative of involvement in the incident, in this context, it does not supply evidence from which a jury could have made an inference about the defendant's state of mind

prior to firing his weapon. *Id.* ¶¶ 29-30. There needed to be more evidence about why the defendant was at the scene and chose to fire his weapon. *Id.* Essentially, in the factual context of *Slade*, the Court of Appeals determined that the post-incident conduct by the defendant alone failed to provide evidence from which a jury could have rationally made an inference as to the defendant's state of mind prior to the firing of a weapon. These facts of *Slade*, though, are clearly distinguishable from the instant case.

{22}     Here, evidence was in fact presented at trial that Defendant entered "The Shop" after the music video had been filmed, as if he was looking for a fight. As well, he immediately engaged Victim—whose family had a history of conflict with one of Defendant's family members—in an argument that led to their relocation outside for a fight. Also, Defendant had a weapon when he arrived at the scene. From this evidence, the jury could have rationally inferred a motive for the killing. *See Flores*, 2010-NMSC-002, ¶¶ 21-22.

{23}     Further, Defendant's conduct following the break-up of the fight was not rash and indeterminate—unlike the *Slade* defendant he was not running from another shooter, shooting only as he went. Instead, he walked over to his girlfriend—who was holding the gun—retrieved the gun, readied it for fire, turned, aimed, and shot. The

13

evidence also suggests that before the fight was stopped, Victim was winning. From this evidence, the jury could have inferred an express purpose to get the weapon and a deliberate intention to use it to kill Victim, who had just defeated him in a fight, and whom he intended to kill all along. *See Flores*, 2010-NMSC-002, ¶¶ 21-22.

{24} Defendant's conduct following the killing also supports the jury's inference of deliberate intention. Defendant fled the scene, and initially denied ever having possession of a gun. As well, Defendant claims to have no memory of the events that unfolded, and the gun has yet to be recovered. From this evidence, the jury could have inferred a cover-up of guilt, and thereby—in the context of the other evidence presented at trial—the requisite state-of-mind at the time of the killing for first-degree murder. *See Flores*, 2010-NMSC-002, ¶¶ 21-22.

{25} As such, the evidence at trial, taken in a light most favorable to the verdict, was sufficient to support the jury's inference that Defendant's conduct constituted willful, deliberate and premeditated murder. There was sufficient evidence presented to support an inference of Defendant's formation of both pre-fight deliberate intention, as well as post-fight deliberate intention. Rather than establishing that the murder occurred during a crime of passion by rash and indeterminate actions, as in *Garcia* or *Slade*, we hold that the overwhelming evidence in this case is consistent with what we

14

have previously considered in *Tafoya* and *Flores* to be sufficient to support a rational jury's determination that Defendant acted with deliberate intent to kill Victim. *See Tafoya*, 2012-NMSC-030, ¶ 52; *Flores*, 2010-NMSC-002, ¶¶ 21-22.

**B.      Refusal to Submit Jury Instruction on Self-Defense Was Not Error**

**{26}**      Defendant argues the trial court erred in refusing to give the jury an instruction on self-defense. As discussed, there was evidence that some witnesses believed there was a second shot. But, there was no physical evidence of a second shot—on the videos, or by a shell casing—and there was evidence that the area had a propensity for echo. The trial court refused to give a self-defense instruction because it concluded that there was no evidence of self-defense. The trial court considered the bulk of the evidence regarding a second shot to be allowed only because it was offered to show that the police had notice of the claims in the course of their investigation.

**{27}**      "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. This Court reviews a defendant's requested instruction in a light most favorable to the giving of the requested instruction. *State v. Boyett*, 2008-NMSC-030, ¶ 12, 144 N.M. 184, 185 P.2d 355. Yet, "[a] defendant is not entitled to a self-defense instruction unless it is justified

15

by sufficient evidence on every element of self-defense." *State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305, 187 P.3d 170.

{28}    The instruction for self-defense requires evidence that 1) defendant was put in fear by an apparent danger of immediate death or great bodily harm, 2) the killing resulted from that fear, and 3) defendant acted reasonably when he or she killed. *State v. Gonzales*, 2007-NMSC-059, ¶ 20, 143 N.M. 25, 172 P. 3d 162; UJI 14-5171 NMRA. As well, this Court has hesitated to find a self-defense instruction appropriate when doing so would "license any participant in a physical combat . . . thinking himself about to be the loser, to slay his opponent with whatever weapon he could lay his hands on." *State v. Heisler*, 1954-NMSC-032, ¶ 31, 58 N.M. 446, 272 P.2d 660. One is generally not entitled to a self-defense instruction if the "evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant . . . did act in self-defense." *State v. Sutphin*, 2007-NMSC-045, ¶ 22, 142 N.M. 191, 164 P.3d 72 (omission in original) (internal quotation marks and citation omitted). If no evidence exists to support a defendant's theory of the case, they are not entitled to unsubstantiated jury instructions. *State v. Gaines*, 2001-NMSC-036, ¶ 5, 131 N.M. 347, 36 P.3d 438 (emphasis, internal quotation marks and citation omitted). In this case, there was insufficient evidence to raise a reasonable belief in the juror's

16

minds that Defendant acted in self-defense. Defendant was thereby not entitled to a self-defense instruction, and the trial court did not err in refusing such an instruction.

{29} The trial court concluded that there was no evidence Defendant had been put in fear of immediate death and thereby responded reasonably to that fear in killing Victim. Rather, the evidence suggests that Defendant provoked the fight, the fight was fair, and the threat Victim potentially posed to Defendant had been eliminated before the shooting. Regarding an alleged second shot, video of the altercation indicates immediate panic only after Defendant fired his weapon; that is, the physical evidence indicates that no shots were fired prior to that which killed Victim, or else there would likely have been different behavior on the part of the crowd. Thus, under *Heisler*, *Sutphin* and *Rudolfo* the evidence that could support each element of a self-defense claim in this case is so slight that it was incapable of raising a reasonable doubt in the jury's mind as to whether Defendant did act in self-defense—particularly since the fight had ended, and the threat removed, six seconds prior to the killing.

{30} Before the trial court was evidence that Defendant was the aggressor, that he did not win the fight, that the fight had been stopped and the combatants separated, and that Defendant was not in fear of losing his life—this evidence, the trial court concluded, was insufficient to support an instruction of self-defense. *See Rudolfo*,

2008-NMSC-036, ¶ 17; *Gonzales*, 2007-NMSC-059, ¶ 20; *Gaines*, 2001-NMSC-036, ¶ 5; *Heisler*, 1954-NMSC-032, ¶ 31. We agree with the trial court that the evidence in this case was insufficient to merit a self-defense instruction, and hold that the trial court acted appropriately in refusing the instruction.

{31}    Defendant, though, does not merely challenge refusal of the instruction on the grounds that there was sufficient evidence demanding that it be given. He further argues that, while the evidence might very well be insufficient to establish self-defense, the existence of the second shot being fired is still relevant to the issue of whether the killing was rash and impulsive. Defendant extends this argument to suggest that had the jury been given a self-defense instruction, they would have been more apt to decline to render a verdict of a willful, deliberate, and premeditated murder in favor of a heat-of-passion voluntary manslaughter verdict. We disagree.

{32}    There is no precedent for the proposition that the lack of an instruction on self-defense may somehow prejudice a jury's deliberation by lowering the probability that they would convict of voluntary manslaughter, even when the facts and evidence support a conviction of first-degree murder. In fact, cases cited by Defendant stand for the inapposite proposition that "whenever the evidence is sufficient to raise a question of self-defense, an instruction on voluntary manslaughter should also be submitted to

18

the jury where the evidence supports sufficient provocation of fear for one's own safety," *State v. Abeyta*, 1995-NMSC-051, ¶ 20, 120 N.M. 233, 901 P.2d 164, *abrogated on other grounds by State v. Campos*, 1996-NMSC-043, ¶ 32, 122 N.M. 148, 921 P.2d 1266; and for the proposition that often a jury will need to choose between a conviction of voluntary manslaughter or acquittal based on self-defense, *see State v. Harrison*, 1970-NMCA-071, ¶¶ 41-47, 81 N.M. 623, 471 P.2d 193. We hold that on the facts of this case the jury would not have considered entering the lesser-included offense of voluntary manslaughter simply because it was given an instruction on self-defense. The evidence presented does not establish a valid claim of self-defense, as Defendant was not reasonably responding to a stimulus placing him in fear of his own life. Rather, he was the aggressor—who had just got the worst-end of a fight. The facts remain valid regardless of the instruction. The trial court did not err in failing to give the instruction, with respect to the merits of the self-defense claim, as well as the relevance of such an instruction to the jury's consideration of voluntary manslaughter.

{33} Defendant lastly submits that the evidence in this case reflects and supports only the lesser offense of voluntary manslaughter as the killing was substantially provoked by a sudden quarrel with Victim using brass knuckles. Coupled with the fear

of being shot, which as discussed was unsubstantiated, Defendant argues this is a classic example of voluntary manslaughter. Because we hold that the evidence in this case was sufficient to support a jury's conviction of first-degree murder based on Defendant's deliberate intention to kill Victim, we need not consider Defendant's request that we enter a verdict of voluntary manslaughter.

## III. CONCLUSION

{34}    For the foregoing reasons, we affirm Defendant's conviction for first-degree murder.

{35}    **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**



_____
**CHARLES W. DANIELS, Justice**

20

_____

**JUDITH K. NAKAMURA, Justice**